W. H. MOORE LUMBER COMPANY *v*. STARRETT.

Opinion delivered January 18, 1926.

1. MASTER AND SERVANT—INDEPENDENT CONTRACTOR DEFINED.—An independent contractor is one who, in the course of an independent occupation, prosecutes and directs the work, using his own methods to accomplish it, and represents the will of the company only as to the result of his work.

2. MASTER AND SERVANT—INDEPENDENT CONTRACTOR—EVIDENCE.—In an action against an employer for alleged negligence of an employee, evidence *held* to establish that the alleged employee was an independent contractor.

Appeal from Hot Spring Circuit Court; *Thomas E. Toler*, Judge; reversed.

*Murphy & Wood*, for appellant.

*D. D. Glover* and *H. B. Means*, for appellee.

WOOD, J.   On the 24th of January, 1924, Sam Starrett filed his complaint in the Hot Spring Circuit Court, in which the W. H. Moore Lumber Company (hereafter called company) and one W. M. Fleetwood were named as defendants.   Starrett alleged in substance that the company was a corporation engaged in the manufacture of lumber, one of its mills being situated in Hot Spring County, and that Fleetwood was in charge of its sawmill department and running the same for the company in cutting timber at a stipulated price per thousand feet; that on the 22d day of July, 1922, the plaintiff was in the employ of the defendants, and, under the orders and directions of his foreman, was operating an edger; that the edger and machinery being run by the defendant was unsafe and dangerous in that it would permit the lumber, while being operated through it, to kick back in the direction of the one operating the same; that the key that held the edger saw upon the shaft was defective and unsafe, and would permit the saw, while it was in operation, to move from side to side and come in contact with the lumber, and because of such defect the lumber would be thrown back from the side from which it was being fed into the edger; that, while the plaintiff was in the dis-

charge of his duty, one of the defendants' other employees negligently and carelessly, in handling a plank coming through the edger, caused the plank to come in contact with the saw which caused the piece of lumber to be kicked back through the rollers, striking the plaintiff in the right side and hip, and knocking him into a hole which had been negligently and carelessly left open by the defendants without a railing around the same; that, by reason of the failure of the defendants to exercise ordinary care to provide him with a safe place to work and safe machinery with which to do his work, and the negligence of his fellow-servant in handling the plank, he was severely injured, to his damage in the sum of $5,000, for which he prayed judgment.

The company answered and, among other things, denied that it was engaged in the operation of a sawmill at the time of the alleged injury to the plaintiff, or engaged in the manufacture of lumber or other products as alleged in the complaint; the company denied that it had any control or management of said sawmill at that time, but set up that the mill at the time of the alleged injury to the plaintiff was being operated by one W. M. Fleetwood, who was in full charge thereof, and running it on his own account under lease from the company. The answer denied specifically all allegations of negligence, and also the allegations as to appellant's injury set forth in the complaint, and set up the affirmative defenses of contributory negligence and assumed risk.

Fleetwood, in his separate answer, admitted that he was in charge of the sawmill department of the mill and running the same for the company in cutting its timber into lumber for a stipulated price per thousand feet. He denied that the plaintiff was in his employ on July 22, 1922, and denied all the allegations of the complaint as to negligence and injury to the plaintiff, and set up the affirmative defenses of contributory negligence and assumed risk.

The evidence was heard on the issues raised by the pleadings, and the court submitted these issues under the evidence upon written and oral instructions. In its oral instructions it told the jury that it was for the jury to determine whether the defendants were both liable or whether only one of them was liable, and which one, and, if the jury found that both were not liable, but that one was liable, they should return their verdict accordingly; and that if they found that the defendants were neither liable individually or jointly, they should return a verdict in favor of the defendants. The jury returned the following verdict: "We, the jury, find for the plaintiff solely against the defendant, W. H. Moore Lumber Company, in the sum of $1,250 and costs." Judgment was entered against the company in that sum, from which it prosecutes this appeal.

The conclusion we have reached after an examination of the entire record in the case makes it unnecessary to set forth the testimony and instructions of the court bearing upon the issues of negligence, contributory negligence and assumed risk.

On the 1st of September, 1921, the W. H. Moore Lumber Company entered into a written contract with W. M. Fleetwood. The contract provided in substance that the company was the owner of 1600 acres of timber lands in Hot Spring County, Arkansas, and also was the owner of a sawmill in that county; that it was the intention of the parties to enter into a contract whereby Fleetwood would take over the operation of the mill for the logging and manufacture of timber into lumber. It was agreed that the company would furnish Fleetwood the mill and all its appurtenances for the purpose mentioned, and that Fleetwood would take possession and operate the same for that purpose. The timber was to be manufactured into merchantable lumber by Fleetwood, which was to be handled by him in a certain manner as specified in the contract, and when so handled it was to be received by the company on the mill yard. For the

purpose of securing logs to be manufactured into lumber, Fleetwood was to cut the merchantable timber on the lands belonging to the company and all other merchant- able timber which the company might acquire in that locality, and he was to cut the trees and saw the logs and preserve the same according to certain specifications set forth in the contract. In consideration of Fleet- wood's performing the contract on his part, the com- pany agreed to pay him on a basis of $10 per thousand feet, log scale, for all the lumber he manufactured. The logs were to be scaled by a person to be mutually agreed upon by the parties according to the Doyle scale stick. Fleetwood agreed, in consideration of the payments thus to be made him by the company, that he would "pay all costs of labor, and maintenance and repairs on the mill, and all other expenses entering into the logging and manufacture of said timber into lumber" and to save the company "harmless as against all claims for labor, main- tenance or otherwise, entering into the manufacture of said lumber." Fleetwood agreed that he would en- deavor to manufacture the lumber in consistent average amounts not less than 100,000 feet per month, and not more than 200,000 feet, unless larger amounts were re- quested by the company, and, if so, then he would en- deavor to supply the amounts desired. Fleetwood also agreed to purchase of the company certain teams, wagons and harness that were then being used at the mill, for which he agreed to pay the sum of $2,000, by permitting the company to deduct the sum of $1 per each thou- sand feet of log scale at each settlement period until the purchase price of $2,000 was paid.

The company retained a lien on the teams, wagons and harness until the purchase price was paid. Fleet- wood had the privilege at any time to pay any balance of the purchase money in cash, and thereupon to obtain an absolute ownership of the teams, wagons and harness, and, until the purchase money was fully paid, Fleetwood agreed that he would not dispose of this property or

remove the same from Hot Spring County without the consent of the company. It was agreed that the compensation specified in the contract to be paid Fleetwood by the company was based upon the then prevailing prices of labor in the locality of the mill and timber, and if at any time prior to the fulfillment of the contract there should be a material change in the price of labor an adjustment of the compensation to be paid Fleetwood by the company should then be agreed upon in accordance with the change, and if the parties could not agree, the matter should be submitted to arbitration, and the decision of the arbitrators should be binding upon both parties.

It was further agreed that if the mill should be destroyed or badly damaged by fire or tornado during the life of the contract, so that it could not be used, then the company should have the option to rebuild or repair or declare the contract ended. If the company exercised the option to rebuild or repair, then such option would have to be exercised in a reasonably prompt manner. By its terms the contract went into operation on the 1st day of September, 1921.

Both Fleetwood and Moore testified that at the time of the injury to the appellee the mill was being operated in the manufacture of timber into lumber by Fleetwood under a contract; that the appellant had nothing whatever to do with the operation of the mill at that time. According to Fleetwood's testimony, after the appellee was injured witness took him to St. Joseph's Hospital, in Hot Springs, and paid the doctor's bill for his treatment, as was his custom for his employees. There was one planing mill in connection with the plant, but the witness didn't have any control over that. It was in charge of Moore. The two mills were connected by a tramway. Under the contract witness was to receive $10 per thousand feet for the timber cut into lumber, log scale, and witness paid the expenses of operating the sawmill out of that. Moore gave instructions to witness about how

the lumber should be cut, and witness obeyed Moore's orders in this respect. Witness was running a commissary at the plant, and the goods were shipped in the name of W. H. Moore Lumber Company, and Moore paid the bills for awhile and then quit, and after that witness paid the bills. The men were all supplied out of the commissary, and the amount of their accounts was taken out of their wages, and witness had for his services what was left of the $10 per thousand after the expenses were paid. Moore selected the men who were to scale the logs. It was reserved in the contract that he was to be consulted about that, and they agreed on the men selected by Moore. Some of the new parts of the machinery that were added to the sawmill after the contract was entered into Moore paid for, and part of them witness paid for. Moore obtained a couple of new saws, put in a heater, and did some repair work on the dry kiln. He also, after an arrangement between him and witness, paid for fitting up a lath mill. Witness further testified that, after Moore was sued and had filed his answer alleging that the witness was an independent contractor, he had a conversation in which he told witness that if he (witness) would stay out of Hot Spring County they could not obtain any service on him. Service had been obtained on witness in Hot Springs, Garland County, which service witness understood was all settled, and in speaking of this Moore told witness that that service was not legal, and then told witness that, inasmuch as he was an individual, they could not get legal service on him if he would stay out of Hot Spring County. *Witness employed the appellee to work for him at the sawmill and paid him for his labor. Moore did not tell witness whom to hire or whom to discharge, and none of the employees, were under Moore's control or direction. Witness paid for the labor, and Moore paid witness. Witness paid for the labor whether he made money enough to do it or not. Witness always got money enough from Moore to pay them. Moore furnished witness the money and charged*

*the same to witness and credited witness with the timber when same was produced.*

According to the testimony of Moore, he had no control whatever of the sawmill at the time the appellee was injured. The lumber was to be manufactured in the manner witness desired, and the only say-so witness had was as to how the lumber was to be cut and what size. Witness did not employ any of the laborers for the appellee nor give them any directions. Witness had control of the planing mill, which was three or four hundred yards from the sawmill. The planing mill was run by different machinery entirely, and Fleetwood's contract was terminated when he ran the lumber through the kiln and out on the dry shed side. The common lumber was to be stacked in the yards, and when that was done Fleetwood's contract with witness was completed. The planing mill then took charge of it and handled it. Witness never had the appellee in his employ and didn't even know him. Witness stated in regard to the commissary that Fleetwood came to Hot Springs when he thought of putting in the commissary, and he was a stranger in that part of the country and had no established credit. Witness arranged with the Plunkett-Jarrell people for Fleetwood to get goods there, and the amount to be paid out of what was coming to him on his contract once a month. Witness didn't know whether the groceries Fleetwood bought were charged to witness or to Fleetwood. Witness simply loaned Fleetwood his credit to use in his commissary, and Fleetwood paid the bills and made whatever profit there was out of it. Witness had nothing whatever to do with running the sawmill except to give instructions as to the character of lumber and the amount of the lumber witness wanted cut while Fleetwood was running the mill. Witness was now operating the planing mill and had a foreman who employed the labor for witness, and this foreman fired the laborers when he got ready to do so. This foreman, every two weeks, makes out a payroll and sends it to the office,

and checks are made out directly to the individual laborer for his time. But in the case of Fleetwood a check was made direct to Fleetwood for whatever credit he had for the lumber manufactured. When witness was operating the plant himself, he told his foreman at what rates to hire the men, and when he was around, his foreman consulted him about these matters, and if witness was not there his foreman hired and fired the men whenever he chose to do so. In regard to the commissary, witness had an open account with Fleetwood. Witness credited him with the log scale and charged him with whatever amounts he drew. One time, while Fleetwood was operating the mill, he complained to witness that he was needing some saws. Witness realized that Fleetwood couldn't make good lumber without good saws, and he agreed to buy a couple of saws and make Fleetwood a present of them. Witness was under no obligation to buy them. Witness did not procure a drive-belt for the machinery. It was to the interest of witness to increase the capacity of the mill, and witness, to that end, bought a heater to increase the steam power so that they could get enough steam to dry the lumber. Fleetwood had the brick walls torn down around the boiler, and hauled brick from Malvern and relined them. He spent a thousand dollars in fixing up the mill to start with. The mill was operated by Fleetwood under the contract, and the timber cut by him belonged to witness. As to wagons and teams sold Fleetwood under the contract when Fleetwood left, under an agreement between them witness took the same back and sold them. As to the log scaler, Fleetwood first had a man there whom he employed, and witness also afterwards had a man there. It was agreed between them that a man should be selected that was mutually agreeable to them. That was the understanding. Witness didn't remember making any suggestion to Fleetwood about staying out of Hot Spring County to avoid service of summons on him. Witness might have told him that if he would stay out of Hot Spring County

they could not get service on him. Witness didn't consider that witness was responsible in any way for the injury to appellee. When witness himself was operating the mill by day work, he paid the men by the thousand to cut the timber. Under the contract with Fleetwood witness had nothing to do with the cutting of the timber into lumber, but paid Fleetwood by the thousand for manufacturing the same.

The appellee Starrett testified that at the time he received his injury he was employed at the W. H. Moore Lumber Company putting the lumber through the edger. They told witness it was the W. H. Moore Lumber Company's mill. Witness got the job from Fleetwood. Witness thought that Moore was one of Fleetwood's bosses. Witness was asked the following: "Q. What did Mr. Moore seem to be doing about there? A. Well, he would just come through the mill generally when he would come down, walk through and see how everything was going on, and whether everything looked to suit him or not, I reckon. I don't know what his ideas were, but if he saw anything he didn't like he would tell them about it, and he would call Mr. Fleetwood off or make remarks about how things should go on or how it would be best for it to go on, or something like that; I don't know for sure just what he would tell them. * * * It showed that he had things to do with it or showed that Fleetwood was working under him, the same as I was under Fleetwood, by all appearances, and any one, when Mr. Moore would come around, it would be just like you were working for a head man, when the head man came around you would go to talk to him, you might be a straw boss under the head man. That was the way Mr. Fleetwood acted, like the straw boss. Mr. Moore would come around and they would have to have a conversation, and they would walk through the mill sometimes." The witness stated that he didn't think that Mr. Fleetwood, during the time he was there, had any direction over the planing mill department. Witness further stated that Moore would come

through there sometimes and give orders if he saw anything that he didn't like. He would talk to Ted Snow. If the trimmer saw didn't cut the material right, he would say something about it ought not to do that, or that wasn't the way it ought to be done. He would tell Ted Snow how to do it, and jack him up if the trimmer saw didn't run right.

The above is the material testimony bearing upon the issue as to whether or not Fleetwood was an independent contractor in the operation of the sawmill at the time the appellee received his injury. It will be observed that the contract expressly states that it was the intention of the parties in making the contract that the company should turn over the mill and timber to Fleetwood for the purpose of manufacturing the timber into merchantable lumber. The timber was to be cut and manufactured into lumber and be handled in a certain manner set forth in the contract. The company was to furnish the mill and timber and pay Fleetwood, as a certain compensation named therein, an amount for the manufacture of the timber into lumber. Fleetwood on his part was to take possession of the timber and mill and manufacture the timber into lumber according to the specifications of the contract. The contract specified as follows: "In consideration of the payments as herein stated, the party of the second part agrees to pay all costs of labor, maintenance and repairs on the mill and all other expenses entering into the logging and manufacture of said timber into lumber and to save the party of the first part harmless as against all claims for labor, maintenance or otherwise entering into the manufacture of said lumber as herein provided."

In *J. W. Wheeler & Co.* v. *Fitzpatrick*, 135 Ark. 124, we defined an independent contractor in the language of Judge Elliot as follows: "An independent contractor may be defined as one who, in the course of an independent occupation, prosecutes and directs the work himself, using his own methods to accomplish it, and represents

the will of the company only as to the result of his work.''
2 Elliot on Railroads, p. 863, § 1063. And further, the
definition as contained in 2 Words & Phrases, p. 1034:
''An independent contractor is one who, exercising an
independent employment, contracts to do a piece of work
according to his own methods and without being subject
to the control of his employer, except as to the result of
the work.''

Now, under the above definition, according to the
plain provisions of the written contract, the relation as
between the company and Fleetwood at the time of the
injury to the appellee was that of independent contractor
rather than that of master and servant. It occurs to us
that the testimony *aliunde* is not sufficient in legal effect
to overcome the express provisions of the contract. Nor
does this testimony justify the inference to be drawn
by the jury that the relation between the company and
Fleetwood at the time of the appellee's injury was that
of master and servant or employer and employee, rather
than that of owner and lessor on the part of the company
and lessee and independent contractor on the part of
Fleetwood. Therefore it is the duty of the trial court
under all the evidence adduced as a matter of law to
so construe the contract.

It could serve no useful purpose to discuss the testi-
mony *aliunde*. We have set it forth, and it speaks for it-
self. Learned counsel for the appellee contends that, be-
cause there is testimony tending to show that the com-
pany, after the contract was executed, and while Fleet-
wood was operating thereunder, bought new saws and
built other parts to the sawmill and added a lath mill,
this would warrant an inference that the company
was operating the sawmill, but this is not so, for the rea-
son that, under the terms of the contract itself and the
uncontradicted testimony of Moore, the company was
interested in the output of the mill and in the result of
the operation by Fleetwood, and if it desired to make the
result of the operation more effective by increasing the

output of Fleetwood's contract by adding new parts and machinery in addition to the machinery already furnished and the compensation it was paying Fleetwood, this was not inconsistent with the relation that it sustained to Fleetwood as owner and lessor, and only tended to prove that the company was interested in the result of the contract and was endeavoring to make the same more profitable to them both.

The same may also be said in regard to the testimony as to the commissary and the sale of the wagons and teams to Fleetwood. Likewise the same may be said with reference to the testimony of the appellee to the effect that when Moore would come around the sawmill he would have conversations with Fleetwood, and that his conduct was such as to impress the appellee that Fleetwood was a straw boss under the head man, Moore. Of course, the opinion of the appellee as to the relation of Moore to Fleetwood was not competent testimony, and the appellee's testimony to the effect that Moore, when he passed through the mill, would give orders if he saw anything that he didn't like, and would say to the trimmer that he ought not to do that, or that was not the way it ought to be done, and would tell him how to do it, and jack him up if he didn't run the trimmer saw right, did not tend to prove that Fleetwood was not in control of the sawmill. All this was perfectly consistent with the company's relation to Fleetwood as owner or lessor, and would only tend to prove that the company was generally interested in the result and output of its contract with Fleetwood, and endeavoring to make such contract more effective and profitable to both of them. In the absence of any proof tending to show that the written contract was a mere camouflage to cover up the real relation between the company and Fleetwood, and that such relation was in fact merely that of employer and employee, or master and servant, the court should not have ignored the plain and unambiguous terms of the written contract, and should have declared as a matter

of law that the relation of master and servant did not exist between the company and Fleetwood, as requested by the appellant in its prayer for instruction No. 1. The court erred in not granting this prayer.

In *St. L. I. M. & S. Ry. Co.* v. *Gillahan,* 77 Ark. 551, we quoted from Judge Elliott as follows: ''An independent contractor may be defined as one who, in the course of an independent occupation, prosecutes and directs the work himself, using his own methods to accomplish it, and representing the will of the company only as to the result of his work. Generally, where an independent contractor is employed to perform a work lawful in itself and not intrinsically dangerous, the company, if it is not negligent in selecting the contractor, is not liable for the wrongful acts or negligence of such contractor; and, in order that the company shall be liable in such a case, it must appear that it either exercised or reserved the right to exercise control over the work, or had the power to choose, direct and discharge the employees of the contractor. In general, it may be said that the liability of the company depends upon whether or not it has retained control and direction of the work. But neither the reservation of the power to terminate the contract, when in the discretion of the engineer the work is not progressing satisfactorily, the right to exercise general supervision and inspect the work as it progresses, nor the right to enforce forfeitures, will change the relation so as to render the company liable.'' 3 Elliott on Railroads, § 1063, p. 1586.

The doctrine announced in the above case and in the case of *Arkansas Natural Gas Co.* v. *Miller,* 105 Ark. 477, and *Arkansas Land & Lumber Co.* v. *Secrist,* 118 Ark. 561, when applied to the facts of this record, show conclusively that Fleetwood was an independent contractor and that he alone, if any one, was liable for the injury to the appellee. See also *Hardy* v. *Hardy,* 144 Ark. 375, and *Harkins* v. *National Handle Co.,* 159 Ark. 15. The case, to be sure, must depend upon its own pecu-

liar facts, but the above cases are more nearly applicable to the facts of this record than the case of *Wheeler & Co.* v. *Fitzpatrick, supra,* upon which counsel for appellee rely. In the latter case there are many features in the testimony which clearly distinguish it from the case at bar.

It follows that, for the error indicated, the judgment must be reversed, and, inasmuch as the testimony seems to have been fully developed, the cause will be dismissed.