THE ARKANSAS POWER & LIGHT COMPANY *v.* RICHENBACK.

4-5121

Opinion delivered June 20, 1938.

*House, Moses & Holmes* and *Ingram & Moher,* for appellant.

*A. G. Meehan* and *John W. Moncrief,* for appellee.

MEHAFFY, J. Appellee, C. P. Richenback, brought suit against the appellant, Arkansas Power & Light Company, in the Arkansas circuit court. He alleged in his complaint that he was injured by the negligence of the appellant when he was riding in a truck which was being used at the time to transport the property of the appellant from Stuttgart to DeWitt, Arkansas. It is alleged that there was negligence in the manner in which the truck was loaded, and also that the driver of the truck was negligent in his operation.

The appellant filed answer denying all the material allegations in appellee's complaint and alleging that if appellee was injured the injury resulted from one or more

of the risks and hazards incident to his employment, or from one or more of the risks and hazards which were open and obvious, or from one or more of the risks or hazards of which the appellee had knowledge and appreciated the danger, or from a concurrence of two or more of said risks and hazards, and appellant pleads assumption of risk in bar of appellee's right to recover. It also alleged in its answer that the driver of the truck was not its servant but was an independent contractor and alleged that if appellee was injured it resulted from his own carelessness and negligence, and his carelessness and negligence was the sole and proximate cause of his injury, if any, or contributory thereto, and appellant pleads the carelessness and negligence of appellee as a bar to his right to recover.

There was a jury trial and a verdict and judgment in favor of appellee for $6,000. This appeal is prosecuted to reverse said judgment.

The evidence showed that Ronald Jones was driving his own truck, but was hauling property for the appellant; he was paid $1 per hour for himself and truck; he drove wherever appellant directed him to, took just such property as appellant pointed out, but did not assist in the loading. On the particular day that the accident occurred, the foreman of appellant directed him to take his truck to Stuttgart at a certain place and there the foreman superintended the loading of the truck. Besides other property, there was loaded in the truck a pole about 25 feet long, and it extended about 13 feet behind the back end of the truck. It was loaded on the left side of the truck at the direction of the foreman. There is some conflict in the evidence as to what was said at the time the pole was loaded, the appellee testifying that he insisted that the pole should be put on the right side; but there is no conflict as to the pole being put on the left side as directed by the foreman. They were driving in the direction of DeWitt and another truck approached from the rear and struck the end of the pole and then struck the back end of the truck in which appellee was riding. The said truck went into the ditch and appellee was injured.

Appellant's foreman directed Jones where to go and when to go. Jones testified that they would direct him about backing his truck under a pole when a transformer was to be hung. He would place the truck as directed by the foreman. The bed of the truck he was driving was 12½ feet long from outside to outside, and seven feet, nine inches in width. Jones testified that on the morning of the injury his truck was at the barn of the appellant; had been left there overnight; he reported there at about seven o'clock; the appellee was working for the company at that time and was one of the men that witness transported from place to place; that was a part of his work; that he transported the material used on the job from place to place; the morning of the accident there was some material loaded in the truck, but Jones did not pay any attention to what was loaded; it was the foreman's business to look after the loading of the truck; witness was in the cab of the truck at the time the men were loading and did not pay any attention to them; at the time they were loading the truck witness did not know where he was to drive the truck that day; the material loaded on the truck was to be used by the company at some point on its line; when the foreman got in the cab of the truck with witness he gave witness instructions where to go; the men got in the bed of the truck; witness was told by the foreman where to go after the material was loaded, and on this occasion he was told to go to DeWitt; the road is about 16 feet in width; when witness passed anyone, as a rule he would pull one wheel off the asphalt to the dirt portion of the road; that would depend on the width of the vehicle that he was driving; witness testified that the truck approaching did not sound any horn; the road at that point was open and straight; he said he could see a short ways back by the use of the mirror; if the mirror was adjusted he could not say whether he could see a quarter of a mile back or not; he had a mirror on his truck; witness said the truck that hit him from the rear belonged to the Chaney Motor Company of DeWitt; the truck was about seven feet wide; at that place the asphalt pavement was about 14 feet wide and the bed of the truck would stick out over the wheels;

his wheels at the time of the accident were about nine inches from the edge of the pavement; that it would be about nine inches from the right wheel of witness' truck to the edge of the pavement; when the rear truck hit the pole and sheered his truck toward the ditch, witness began to straighten up and it hit a second time, and that is what put them in the ditch; witness' truck was twelve feet in length and the pole stuck out over the rear of the truck 12 or 13 feet; the truck in the rear was driven much faster than witness' truck was going; after the wreck witness saw appellee and he was hallowing like he was hurt; about that time a car came along and took appellee to town; the width of witness' truck was seven feet, nine inches; witness left the truck at the company plant all night; when he left the barn that morning he does not know whether there was a red flag on the end of the pole or not; after the wreck he walked around and there was a red flag on the end of the pole; he was driving about 25 miles an hour; the truck that ran into him was driving about 35 miles an hour; the first time he knew that anybody was approaching from the rear was when the impact came; when the rear truck hit the pole this caused witness' truck to proceed toward the right in the direction of the ditch, and about the time he got straightened up he was hit again from the rear. Witness was usually told the night before where they were going next morning, and the foreman would tell him when the men were ready to come back; the pole went through the extreme left side of the bed of the truck; when he was first hit he thought his front wheel was nine inches from the edge of the pavement; when placing the truck where the man could hang a transformer, he acted in obedience to the foreman; the foreman would tell him when and where to drive his truck; if witness had been noticing in the mirror and had the view extended back to the rear far enough to see the car approaching, he would not necessarily pull off the asphalt onto the dirt; if he saw a car approaching and thought he was going to have an accident he would pull over on the dirt portion; when the accident happened he had no warning that anyone was approaching; on the road between Stuttgart and DeWitt there is a lot of traffic in both directions.

The appellee testified that he had been engaged in farming and doing any kind of work that he could get to do; he never got past the fourth grade in school and had no training except working on a farm; had a wife and five children; he had been working for the Arkansas Power & Light Company off and on for about three years; did any kind of work for the company except climb poles; most of the time would dig holes and hand things up to the linemen; help load and unload trucks; they would sometimes work a day at a place or perhaps two days and at other times would not work over two hours; would move from point to point during the course of the day's work; the morning of the day that he was injured he reported to the company's barn and the other employees were there also; they were constructing lines over the county, working at different places, and would go from place to place on a truck; the company always furnished means of transportation on the morning of the day he was injured the foreman came to the barn soon after witness got there; witness waited until he got there because he did not know what to do; when the foreman got there they loaded a couple of kegs of bolts, one keg of water, and three rolls of wire; witness helped load this under the directions of the foreman; truck was driven by Jones; they also loaded a 25-foot pole; after they had loaded the kegs and wire, Jones drove the truck to the pole pile and they loaded the 25-foot pole; witness and another employee put the pole on the truck and witness said they had better move the tool box so they could get the pole in; they were putting it on the right side; the foreman told them to put it on the left side; when witness told the foreman he thought it would be better to put it on he right side the foreman said that he and Jones were driving this truck and they would take care of it; they put the pole where the foreman told them to and then the foreman directed Jones to go ahead; the foreman got into the cab with the driver; witness did not know where they were going; he had nothing to do with the management of the truck; witness saw the rear truck coming down the road and figured that Jones would pull off so that the rear truck could pass; from the time the rear truck

struck, witness did not know anything; he was thrown out of the truck, was in great pain, and when they got to the hospital at Stuttgart they gave him a shot and that is the last he remembers; stayed in the hospital until the following Monday and had not quit suffering when they left the hospital; they took some X-ray pictures; witness tried to work in the garden at home for three or four days, but he could not work; would have to go in and lie down. Witness then testified at length concerning his injuries and said that on the truck they carried all kinds of material at different times; that Duncan helped him load the pole that morning and there were three other men on the job; there was a red flag on the end of the pole; after the pole was loaded appellee got in the truck and sat down on one of the kegs; the back end of the truck was open so that he could see anything approaching from the rear, and he saw the truck coming down the highway; the driver of the truck did not blow his horn; Jones was driving about 25 miles an hour; the truck which approached from the rear was going about 40 miles an hour; witness could see the truck approaching for about a quarter of a mile; the pole did not move or sway back and forth in the truck; they never carried more than two poles at a time; witness knows that a driver with a proper mirror can keep a lookout; witness relied on the driver of the truck to keep a lookout by means of the mirror and said that the driver could keep a lookout with a proper mirror; when witness realized that the driver of the truck he was in was not doing anything to go to the right, witness did not have time to do anything; witness had observed Jones drive on the right side, or dirt portion of the road, and people passing had pulled over to the shoulder; the width of the asphalt was 14 feet; witness was present when it was measured; the width of the dirt shoulder was four feet; the foreman was present and the driver was around about the cab of the truck when it was loaded that morning.

The driver of the rear truck testified that the pole was sticking out at the back of the truck 12 or 13 feet and that he played along behind about a mile and traffic cleared to where he could get by and he started to pass

and the front end of his truck got even with the back of Jones' truck and it looked like he began pulling over into the middle of the road; witness gave him the horn and he pulled over about that time and the pole hit the rear truck; the pole was sticking out at the back, and as witness came up to the side it looked like the truck began to pull back to the center of the pavement; he was driving faster than the Jones truck was going; witness was right on the left-hand side of the road when the accident happened, right on the edge; he had to pick up speed to pass the Jones truck; the radiator of the rear truck had passed the end of the pole when the accident happened and witness could not see the pole after he passed the end of it; witness had been driving trucks off and on for several years; this witness also said that when he came up to the Jones truck that it veered to the left and as he got up to him he veered to the right and that is the time it struck.

O. E. Hoggard testified that he got in the cab with the truck driver after the truck was loaded and told the driver where to go, but did not give him any other instructions; told him to go to DeWitt, but did not tell him which road to go nor how fast to drive; had no control over his actions and gave him no orders or directions whatever; there was no one in the front seat besides the foreman and Jones; appellee was in a position to have a good view of any vehicle approaching the rear; all the men could see to the rear and nothing obstructed their view; there was no signal given by the rear truck and witness heard no horn; first knowledge that witness had of anything wrong was when the rear truck hit; witness also said that the driver, Jones, swerved off the right edge of the pike and it looked like he was going into the ditch, but he got his truck under control and about that time there was another impact which carried them into the ditch; the pole was 25 feet long and the truck bed was 12 feet and the pole must have extended out over the end of the truck about 13 feet; there was a red flag put on the pole before they left Stuttgart; witness was using Jones and his truck to transport men and material from one point to another; Jones put the truck at whatever place witness wanted it; he would tell Jones where

to back the truck to the pole where he wanted to hang a transformer; would tell Jones when to go and where to go; Jones might be out on a job 10 or 12 hours a day, depending on the kind of work; does not know who paid Jones for his work; witness did not hire him; the pole was the last thing they loaded that morning; pole was eight inches in diameter; witness told Jones that the pole was on the left-hand side so he could be governed by the location of it in meeting and passing cars and in making turns on the highway; told him the location of the pole so that he might be governed while driving; witness wanted the pole on the left-hand side and that is why he put the tool box against the right side; the truck had a side mirror; did not instruct Jones how fast to drive the truck; the speed usually depends on the load; witness always rode in the cab.

There were a great many witnesses who testified in the case, and the court finally told the attorneys he would not hear any more accumulative testimony on certain points.

Appellant's first contention is that Jones was an independent contractor and not a servant. He was paid one dollar an hour for himself and truck. The foreman, however, did not know who hired him and, of course, knew nothing about the contract; he knew, however, that Jones took his truck wherever the foreman told him to and when it was loaded drove it where he was told; the foreman sat in the cab with him and told him about the pole extending out on the left side so that he could govern his driving accordingly.

There is no contention that the contract with Jones was such that the master did not have the right to control him, and discharge him if it wished to, and it is the right to control and not the actual control, that determines he question whether one is a servant or an independent contractor.

According to Jones' testimony, he was not to assist in the loading, but was to drive the truck wherever told by the master. Unquestionably the time when he worked and where he worked was determined by the master and not by Jones. There seems to us to be no more reason for

saying that Jones was an independent contractor, than there would be for saying that the appellee and other employees were independent contractors. Appellee had nothing to do with the driving of the truck. His business was to dig holes and load the property on the trucks. For this he was paid in exactly the same manner that Jones was paid. The master did not tell him how to dig the holes or exercise any control over it any more than he did over Jones' work. He is no more an independent contractor than the farm laborer would be when plowing in the field. The farmer tells him what to do and he does it, usually in the absence of the master, without any control at all as to the manner in which he does it. There was evidently no written contract between Jones and appellant, and no one testifies to the terms of the contract further than that Jones was to drive the truck and to receive a dollar an hour. If he had been employed to do a certain work for a certain price and the master had no control or right to say as to the manner in which it was done, he might be an independent contractor. According to the evidence Jones went to work when the master told him to, the master directed him where to go to get his load, and where to take it, and, at the time of the injury, the foreman himself was riding in the truck in the cab with the driver.

This court has said, in the case of *Mississippi River Fuel Corp.* v. *Morris,* 183 Ark. 207, 35 S. W. 2d 607: "The vital test in determining whether a person employed to do certain work is an independent contractor or a mere servant is the control over the work which is reserved by the employer. Stated as a general proposition, if the contractor is under the control of the employer, he is a servant; if not under such control, he is an independent contractor." 14 R. C. L. 67; *W. H. Moore Lbr. Co.* v. *Starrett,* 170 Ark. 92, 279 S. W. 4.

"In the case above mentioned the court said: 'An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer except as to the result of the work.' Thompson on Negligence, vol. 1, p. 570; *J. W.*

*Wheeler Co.* v. *Fitzpatrick,* 135 Ark. 117, 205 S. W. 302; *St. Louis, I. M. & So. R. Co.* v. *Gillihan,* 77 Ark. 551, 92 S. W. 793.'' See, also, *Miss. River Fuel Corp.* v. *Young,* 188 Ark. 575, 67 S. W. 2d 581; *Chapman & Dewey Lbr. Co.* v. *Andrews,* 192 Ark. 291, 91 S. W. 2d 1026.

There was no contract in this case to the effect that Jones should do a certain piece of work for a certain price, the master having no control over the manner in which he did it; but he was to drive his truck for the appellant whenever the appellant wanted him to, go wherever the appellant directed to get a load, get the kind of load directed by appellant, haul it to the place where appellant directed, and go back not when he wanted to, but when the master directed him to do so.

The evidence does not show what the contract was, further than to show that Jones was to get $1 an hour for himself and truck. If there had been a contract creating the relation of employer and independent contractor, appellant could have shown this.

Appellant calls attention to the annotations in 19 A. L. R. 1168. The annotations are extensive and include almost every kind of case. There is no case, however, cited that contradicts the views we have expressed here.

Many other cases are cited and relied on by appellant, but this court has repeatedly defined independent contractor, and pointed out the distinction between an independent contractor and a servant. It is, therefore, unnecessary to review other authorities.

Appellant says that it is well settled that if the relationship of master and servant, as between Jones and appellant, did not exist it necessarily follows that there could be no liability on the part of appellant for an injury sustained by the appellee through the alleged negligence of Jones while he, Jones, was pursuing his business, over which appellant had no control. As a general statement of the principle, this is correct.

In the instant case, however, it is alleged that the master was negligent in the manner in which the truck was loaded, and there was evidence to justify the jury in so finding. The undisputed evidence shows that the pole which extended in the rear of the truck 13 feet was placed

on the left side of the truck by the master, or by its direction. The foreman testified that he gave Jones notice of the fact that the pole was on the left side. It is a matter of common knowledge when the truck was turned to the right the pole would swing to the left of the highway, and that was apparently the cause of the rear truck striking the pole. The foreman knew it was dangerous to load it this way and Jones knew it, and for that very reason the foreman called Jones' attention to it. If the truck was negligently loaded and that negligence, together with Jones' negligence, caused the injury, the master would be liable. There is no dispute about the manner in which the truck was loaded, and Johnson, the driver of the rear truck, testified that Jones veered his truck to the right and then immediately to the left. It may be that the driver of the rear truck was negligent, but that would not relieve the appellant from liability for its negligence. If the injury was caused by the combined negligence of the appellant and the driver of the rear truck, the appellant would be liable.

On the question of independent contractor, the appellant asked an instruction which defined independent contractor and submitted to the jury the question of whether Jones was an independent contractor.

Appellant contends that the appellee assumed the risk. This question was fairly submitted to the jury under instruction No. 3 given at the request of appellant, which is as follows: "You are instructed that the plaintiff assumed all the risks ordinarily incident to the work he undertook to do for the defendant company, and also all those risks if plaintiff was aware of the condition of the equipment on the truck on which he was riding and the perils and dangers incident thereto."

The evidence justified the submission of this question to the jury, and it was submitted at the request of the appellant, and there is ample evidence to sustain the finding of the jury on this question.

Appellant complains of certain instructions given by the court, and among other things says that instruction No. 1 is in conflict with instruction No. 2. Instruction No. 1 simply tells the jury that it is the duty of the

master to exercise ordinary care to avoid injuring the servant while he is engaged in the performance of his duties under the directions and control of the master, or authorized foreman. Instruction No. 2 simply tells the jury that the negligence, if any, of a fellow-servant or foreman is the negligence of the master. There is no conflict between these two instructions.

It is also argued that instruction No. 1 assumes that the relation of master and servant exists, and requested the court to modify this instruction by submitting to the jury the question of whether it did exist. In the first place, we do not think that the instruction assumes that the relation exists, and instruction No. 2, given at the request of the appellant, submits this question to the jury.

The instructions as a whole fully and fairly sub mitted every question of fact involved to the jury, and we think there was no error in the court's instructions to the jury.

It is argued that there is no substantial evidence of any injury and that the verdict is excessive. The testimony of the physicians is in conflict about the extent of appellee's injuries, but the physicians who testified for appellee, and other persons who knew the appellee, testified to very severe injuries, and this evidence, if believed by the jury, was sufficient to support the verdict.

All questions of fact, as we have said, were submitted to the jury and its finding on the facts is conclusive here if there is any substantial evidence to support its finding. We think there was ample evidence to justify the jury in finding for the appellee, and we find no reversible error.

The judgment is affirmed.