ODLE v. CHARCOAL IRON CO. OF AMERICA.

1. MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—INDEPENDENT CONTRACTOR.

Where plaintiff was given a contract by defendant to skid poles out of a certain definite area, there being no requirement of personal service by plaintiff, but the work could be performed by substitutes or assistants chosen by him, and the contract gave defendant no right to control either the men or the means of carrying it out, plaintiff was not an employee but an independent contractor, and as such not entitled to compensation under the workmen's compensation act for injuries received by him during the performance of the contract.

2. SAME.

That plaintiff and employees of defendant paid monthly assessments to a physician to furnish certain medical

The question as to who are "employees" within the meaning of compensation acts, is discussed in notes in L. R. A. 1916A, 115, 246; L. R. A. 1917D, 145; L. R. A. 1918F, 201; 8 A. L. R. 1064.

and hospital services, and that defendant encouraged the plan, would have no weight in determining the relation between plaintiff and defendant.

Certiorari to Industrial Accident Board. Submitted January 3, 1922. (Docket No. 16.) Decided March 30, 1922.

George Odle presented his claim for compensation against the Charcoal Iron Company of America for an accidental injury in defendant's employ. From an order awarding compensation, defendant and the Michigan Mutual Liability Company, insurer, bring certiorari. Reversed, and order vacated.

*Beaumont, Smith & Harris* (*Hal H. Smith* and *Albert E. Meder*, of counsel), for appellants.

*William S. Baird*, for appellee.

CLARK, J. Certiorari to the industrial accident board. Was the plaintiff an employee or an independent contractor at the time he suffered the accidental personal injury? If the former, the award must be affirmed, and if the latter, it must be vacated.

Plaintiff, using his horse and harness and assisted by his son, was skidding cedar for the defendant Charcoal Iron Company under an agreement, of which defendant's chief clerk testified:

"*Q.* Mr. Graham, do you know the nature of the contract and the method of payment of the jobbers who do jobbing work for the Charcoal Iron Company?
"*A.* Yes, sir.
"*Q.* What is the method in which that's handled?
"*A.* In this particular case, this man was on for a skidding contract, skidding cedar poles; a certain portion of the country to go over and that was allotted to him to go over, and he goes and takes the poles out as he comes to them; drags the stump out to the sidings and he receives his pay every time he checks up. We used to endeavor to check up once a month,

only that brought out was paid for, the different pieces, and all sizes and pieces.

"*Q.* He is paid on the basis of what he places on?

"*A.* Yes.

"*Q.* Is he assigned a certain section?

"*A.* Yes.

"*Q.* Can he employ others to help him, if he wishes?

"*A.* He can, yes, sir.

"*Q.* These men are never paid by the Charcoal Iron Company?

"*A.* Not without the contract would ask them to pay.

"*Q.* What would be the reason to have those men paid by themselves?

"*A.* The only idea is that if the job be a big one he may have to have help.  Some get along well and others don't.  They probably wouldn't depend on their employer and would come to the office force and ask them to help them out.

"*Q.* There's no contract of employment between the company and the men in the case?

"*A.* No.

"*Q.* Was there any contract of employment between the company and the son of George Odle?

"*A.* No, sir.

"*Q.* In respect to these camps, is there any regulations in regard to the hours of labor; report at a certain time?

"*A.* No; no particular time at all.

"*Q.* Is there anyone from the company who regulates just how they shall make their roads?

"*A.* Use their own judgment.

"*Q.* Anyone to say which road or pole first?

"*A.* No; up to the fellow that's skidding.

"*Q.* Has to get it out to the side?

"*A.* Yes.

"*Q.* Has to come up to schedule?

"*A.* Yes, sir.

"*Q.* If it isn't up to specifications, he's docked?

"*A.* There isn't much docking in the skidding proposition because it cost the skidder as much to skid a pole—could be docked at any time.

"*Q.* Who furnished the tools, etc., that this work was done with?

"*A.* In this case, Mr. Odle had his own horse and harness, the short nature of his own outfit, all he needed, an axe, tongs, a chain or two. At the camps, they are very lenient with these men, and could always borrow anything.

"*Q.* They were loaned to them?

"*A.* Just loaned him whatever—

"*Q.* Was there any foreman directly over this man?

"*A.* Well, of course he worked under a foreman, but this foreman never interfered with him, and if he was getting out stuff enough to be showing he was making enough headway; if he was doing fairly well, there was nothing said, but if very little, probably jacked up about it; would have to hustle a little.

"*Q.* What was desired by the company? Was it the clearing of the section and the placing of these poles?

"*A.* Getting these poles and posts out on the track, where they could be loaded, the sooner the better.

"*Q.* You had no interest in what kind of a horse or—

"*A.* No, nothing at all; used anything he wanted to.

"*Q.* Hired as many men as he wanted to?

"*A.* Yes.

"*Q.* Could he use a sleigh if he wanted to?

"*A.* Sleigh, drays. Some of the contractors do in the winter time. Some work is only short stuff, when they probably use a dray and skid it out; but the jobber uses his own methods of getting it out; up to him. * * *

"*A.* As far as Mr. Odle's case was specified, he was shown a piece of track or swamp to clear up. He could take that out along the track as he saw fit. The company had the right to let him go any time they wanted to. It's only a matter to get what's already cut there and clean it up. His work goes through this skidding and if it ain't all cleaned up, if not cleared, he docks him.

"*Mr. Baird:* If Mr. Odle had not been handling that work to the satisfaction of the company, they would simply discharge him?

"*A.* Yes."

Plaintiff testified:

"Q. Your boy worked with you?

"A. Yes, sir.

"Q. Who paid the boy?

"A. The check was always made out to me.

"Q. Who owned the horse that you worked with?

"A. I did.

"Q. So that this amount that you were getting there, was for yourself and the horse, was it?

"A. Yes, and the boy.   *   *   *

"Q. You fed this horse yourself?   Kept it at home?

"A. Yes.

"Q. Did you have any tools there besides the horse and harness?

"A. Had an axe; not my own; had to get it from the company.

"Q. Using your own most of the time?

"A. Pretty much.

"Q. What was the boy doing?

"A. Dig the stump up; drag it out.

"Q. These scalers you said put you to work—did they lay out a strip for you to work in?

"A. It would be in a little swamp.   I would go and skid it out; didn't matter if a large or small amount.

"Q. You dragged that along the track so it could be loaded on the cars?

"A. Yes.

"Q. The company paid you so much for each length of pole?

"A. They did.

"Q. If that material that came out didn't come up to schedule, what was done then?

"Q. You wouldn't get paid for it?

"A. Unless cut it off.   There wasn't very much of that; very few pieces.

"Q. Did your boy always work with you, every day?

"A. No, not every day; made it three or four days by myself.   *   *   *

"Q. What time did you have to go to work?

"A. Usually—any time we took out.

"Q. They didn't demand that you be there at 6:30?

"A. No.

"Q. What time did you stop work in the evening?

"*A.* Any time they turned in, we hitched up, too.
"*Q.* They didn't demand any certain hours?
"*A.* No.
"*Q.* The hours of labor were not strictly regulated?
"*A.* If we neglected to go out I got a calling down for it.
"*Q.* In other words, they wanted the work done, but didn't demand any specific hours of labor from you?
"*A.* The only thing; wasn't any strain about my being there on time."

A physician conducted a hospital, his own enterprise, and agreed with the employees of the employer to furnish certain medical and hospital service in return for the payment by the employees of monthly assessments. This plan was encouraged by the employer. The plaintiff paid assessments. That fact and that employer encouraged the plan have no weight in determining the relation between the parties.

It appears from the testimony quoted that the contract did not require the personal service of plaintiff. It could be performed by substitutes and assistants chosen by him. It did not give the defendant the right to control either the men or the means in carrying it out. It gave a definite job, a definite and exclusive right to skid out the timber on a definite area, "a little swamp" or "a certain portion of the country." Payments were made to plaintiff alone. He used his own horse and harness. His hours were not definite. True, the defendant sought prompt performance of the contract, and to that end and to protect its timber, reserved the right to terminate the contract, or to discharge plaintiff as it was said. Too, it had the right of inspection, and as was said in *Carleton* v. *Foundry & Machine Products Co.*, 199 Mich. 148:

"He, in following an independent business, undertook to do a specific job of work in his own way, with his own men, and his own appliances, without submitting himself to control as to petty detail as would

an employee; any suggestion that came from defendant was advisory only, without the absolute right of interference; any supervision had to do only with ultimate results."

Counsel for plaintiff contends that here there was such right of control of and interference in, the work by the employer as to bring this case within the holding in *Tuttle* v. *Embury-Martin Lumber Co.*, 192 Mich. 385 (Ann. Cas. 1918C, 664), and *Van Simaeys* v. *George R. Cook Co.*, 201 Mich. 540.   *Opitz* v. *Hoertz*, 194 Mich. 626, and *Lewis* v. *Detroit Vitrified Brick Co.*, 164 Mich. 489, are also cited.

But we think this case is controlled rather by the *Carleton Case, supra,* where the authorities are fully reviewed, and by *Gall* v. *Detroit Journal Co.*, 191 Mich. 405, and *Zoltowski* v. *Ternes Coal & Lumber Co.*, 214 Mich. 231.   It was said in the *Gall Case:*

"One whom the employer does not control, and has no right to control, as to the method, or means, by which he produces the result contracted for is an independent contractor."

In the *Carleton Case:*

"Nor is inspection, or such supervision as may be necessary to secure the ultimate result, sufficient to change the character of the contract, or the status of the parties."

In the *Zoltowski Case* (quoting from syllabus):

"Where an employee engaged as a teamster quit work at 1 o'clock on Saturday afternoon, and thereafter engaged to unload a car of lumber for his employer for the specified price of $12, he was an independent contractor while unloading said car, and the right to have it done in accordance with contract and to inspect for that purpose did not change the relationship, since the employer had no right to control the method or means by which the result to be paid for was to be accomplished."

See, also, *Perham* v. *American Roofing Co.,* 193
Mich. 221; *Holbrook* v. *Olympia Hotel Co.,* 200 Mich.
597.

It follows that plaintiff at the time in question was
an independent contractor and that the award is va-
cated.

FELLOWS, C. J., and WIEST, BIRD, SHARPE, MOORE,
and STEERE, JJ., concurred.

The late Justice STONE took no part in this decision.