KIMBERG v. MURRAY.

MASTER AND SERVANT—WORKMEN'S COMPENSATION ACT—INDEPENDENT CONTRACTOR.

One engaged to cut the trees on a certain strip of land, who was to furnish his own help, tools, and equipment, and receive a certain price per log, and whose methods were not subject to control except as limited to securing

Independent contractor as workman within meaning of workmen's compensation acts, see notes in L. R. A. 1916A, 118, 247; L. R. A. 1917D, 148; L. R. A. 1918F, 206.

Circumstances under which the existence of the relationship of employer and independent contractor is predicable, see note in 19 A. L. R. 1168.

the results contracted for, was an independent contractor rather than an employee, within the meaning of the workmen's compensation act.[1]

Certiorari to Department of Labor and Industry. Submitted January 6, 1926. (Docket No. 19.) Decided March 20, 1926.

Emma Kimberg presented her claim for compensation against David Murray for the accidental death of her husband in defendant's employ. From an order awarding compensation, defendant and the Fidelity & Casualty Company of New York, insurer, bring certiorari. Reversed and order vacated.

*John J. O'Hara* (*Matt F. Bilek,* of counsel), for appellant Murray.

*Derham & Derham* (*Thomas, Shields & Silsbee,* of counsel), for appellant casualty company.

*Kenneth O'Doyle,* for appellee.

STEERE, J. Defendants seek by certiorari review and reversal of an order by the department of labor and industry awarding plaintiff, Emma Kimberg, for herself and children compensation for the accidental death of her husband, David Kimberg, while he was engaged at cutting into saw-logs timber standing on land belonging to defendant Murray. Deceased was working at piecework for one William O'Neil, who was a woods jobber operating under a contract with defendant Murray in cutting and logging the forest products on land belonging to Murray in Menominee county. His contract with Murray included saw-logs, pulpwood, cedar poles, ties and other merchantable products growing upon said land.

Deceased's contract with O'Neil was a typical, oral, piecework contract for "cutting and swamping" trees

---

[1] Workmen's Compensation Acts, C. J. § 42.

of saw-log size and cutting them into saw-log lengths where they fell, on a 10-acre strip of a designated 40, swamping being to clean the accumulated brush and other obstructions immediately around them so the skidders would more easily reach and remove them with their teams. The saw-log trees were scattered over the tract with other timber and estimated to furnish 500 or 600 logs. O'Neil was to pay deceased 22 cents a log for cutting and swamping them.

The first, and, we think, controlling question involved here is whether Kimberg was an independent contractor or an employee of O'Neil. All the elements required to constitute him an independent contractor under our former decisions are shown without any direct dispute, but were held by the commission to have been negatived by O'Neil's testimony that he "had the right to fire" Kimberg.

O'Neil maintained a lumber camp in the locality where he was operating with the usual equipment and agencies for carrying on such work. Some of the men working there were hired by the month while others were engaged in piecework on ties, poles, and pulpwood. The piecework men had the privilege of boarding at the camp if they desired and paying their board, but otherwise had no connection with it. O'Neil had told Kimberg he had some timber to cut, and when Kimberg came to his camp O'Neil offered him a contract of cutting some saw-log timber standing on a designated strip at 22 cents per log. Kimberg looked at it, but, without then accepting, left to look at another prospective job of like nature of which he had learned. He returned in a few days with a partner named Wheeler, and "said they would cut that strip." It involved cross-cut sawing and the nature of the work was such that customarily two men worked together. In the morning of February 8, 1924, the next day after they commenced, Kimberg

suffered an accidental injury which resulted in his death. Before his injury "he (or they) had sawed 48 logs." O'Neil, whose offer they had accepted, was not upon the strip while they were working there nor until he learned Kimberg was injured. His undisputed testimony as to the nature of the contract with these men, and others engaged in piecework, was that they furnish their own tools and equipment and care for them; they "were never told when to go and when to come," were just "supposed to get that timber out;" it was so early in the season he had no occasion for hurrying them, as there were only 500 or 600 hemlock logs to cut on that strip, and it was only necessary they should be cut while the sleighing lasted; to do so in time they would not have to cut more than 25 logs a day, while some men in suitable timber could cut 100 logs in a day.

Kimberg's partner, Wheeler, who had worked in like capacity on similar jobs before, testified that while they were working on this job no one came around where they were working until after Kimberg was hurt; that they did not have or recognize any boss or overseeing foreman, and were their own bosses.

In support of its ruling that deceased was not a subcontractor but an employee under the compensation law, the commission quotes the following excerpt from O'Neil's cross-examination:

"*Q.* You would have a right to fire them, wouldn't you?

"*A.* If they didn't do the work right.

"*Q.* If they didn't swamp to your satisfaction you could fire them, couldn't you?

"*A.* Have to go and tell them to swamp right.

"*Q.* As you went through you observed these men at their work cutting properly and swamping properly. If they didn't do that you told them how to do it and if they didn't follow your instructions they were fired. You could fire them if you wanted to?

"*A.* Yes, sir."

That expression of opinion on a supposititious theory is out of line with his own statement of the contract unless construed as meaning a right to terminate the contract if breached by the contractors.  His testimony is conclusive that Kimberg and Wheeler were not hired by him as employees working for wages by the month or day, but were in performance of a contract to properly cut down and cross-cut into available logs the log timber standing on a specified strip of land, at a price of 22 cents each for the logs it produced.  Provided it was properly done, they were at liberty to cut it as and when they pleased, within the sleighing period.

O'Neil's testimony, taken as a whole, makes plain that this contract was for results and his right of control was limited to results.  He not only testified as to the nature of the contract as before noted but in other parts of his testimony was asked and answered as follows:

"*Q.* As to cutting certain trees?
"*A.* Was to cut all log timber.
"*Q.* Well, now, when you placed Kimberg on that job he was to cut that piece of timber down?
"*A.* That was the agreement.
"*Q.* 22c a log for cutting?
"*A.* Yes, sir.  *   *   *
"*Q.* They were to cut the timber down and then what else were they to do with it?
"*A.* Just leave it lay there, swamp it, that's all. *   *   *   Just so they can get hold to skid them.  *   *   *
"*Q.* Who took the logs out after they were felled?
"*A.* Different parties driving teams there.  *   *   *
"*Q.* After Kimberg cut the timber it was then part of your work to skid that timber?
"*A.* Yes.  *   *   *
"*Q.* Now, if Kimberg while working for you in that place wouldn't do the work the way you wanted it done or with such speed as you thought he should, you would have a right to discharge him?

"*A.* I don't think I could as long as he had that strip of timber to cut.   *   *   *

"*Q.* Did you ever with men working under those conditions put more men on the same strip of ground?

"*A.* Couldn't very well do it.   *   *   *

(By commissioner.)

"*Q.* Did you ever discharge men working the same as Kimberg?

"*A.* I never did.   *   *   *

"*Q.* You had a right to tell them to do it different?

"*A.* When they agreed to cut logs and swamp, if it wasn't swamped right I would tell them then.   *   *   *

"*Q.* Any pieceworkers ever quit you?   They haven't quit you?

"*A.* Not while working on a strip.   *   *   *

"*Q.* Now, Mr. O'Neil, you wanted Kimberg to cut and swamp these logs for you.   If Kimberg didn't cut and swamp those logs the way you wanted them cut and swamped you could fire him and put some one else on the job?

"*A.* I don't think I could.   Certainly would have to cut the logs and swamp them right before they could get their pay.   If they didn't do it right they couldn't get their pay."

Taken in its entirety, O'Neil's testimony clearly discloses that when dealing with the actual facts in this case he recognized that the contract was for results; that he did not furnish any of the equipment nor control the methods or means by which Kimberg and Wheeler were to produce the results contracted for; that whatever power of supervision he had was limited to securing such ultimate result and could not change the status of the parties or character of the contract. By the controlling undisputed facts deceased is shown to have been an independent contractor under the principles discussed in the following cases: *Gall* v. *Detroit Journal Co.*, 191 Mich. 405 (19 A. L. R. 1164) ; *Carleton* v. *Foundry & Machine Products Co.*, 199 Mich. 148 (19 A. L. R. 1141) ; *Zoltowski* v. *Ternes Coal & Lumber Co.*, 214 Mich. 231; *Odle* v. *Charcoal Iron Co.*, 217 Mich. 469; *Gross* v. *Iron & Chemical Co.*, 219

Mich. 200; *Polka* v. *Lynch Timber Co.,* 227 Mich. 606. We find those cases controlling here.

It follows that the award of the commission must be and the same hereby is vacated.

BIRD, C. J., and SHARPE, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.