MOORE AND CHICAGO MILL & LUMBER COMPANY
*v.* PHILLIPS.

4-5180                                    120 S. W. 2d 722

Opinion delivered October 17, 1938.

*Austin M. Coates, Coleman & Gantt* and *Daggett & Daggett,* for appellants.

*E. W. Brockman, Reinberger & Reinberger* and *Bridges & Bridges,* for appellees.

GRIFFIN SMITH, C. J. Judgments aggregating $12,125 to compensate personal injuries sustained by Adeline Phillips, Kathleen Williams, and Fitzhugh Brunson, were returned on jury verdicts against Arthur Moore, Allen King, and Chicago Mill & Lumber Company, the latter a corporation.

It is alleged that Moore and King were employees of the corporation; that in April, 1937, the three plaintiffs, mentioned *supra*, were in an automobile driven by Brunson; that a truck belonging to Moore and driven by King, with whom Moore was riding, collided with the Brunson car; that the three plaintiffs were severely and permanently injured, and that at the time the accident occurred Moore and King were engaged in a mission for Chicago Mill & Lumber Company.

There is a great deal of testimony explaining how the accident occurred, much of which is in conflict. There were questions of fact for the jury's consideration, presented under proper instructions as to Moore and King, and the judgments against them are affirmed.

As to the Chicago Mill & Lumber Company, the situation is different. In 1934 Arthur Moore, who had previously lived at Vicksburg, Mississippi, moved to a farm near West Helena, Arkansas. For many years he had been engaged in the timber business, principally as a logging contractor. After going to West Helena, he executed various contracts with Howe Brothers Lumber Company and Shannon Lumber Company, under which he cut and delivered timber from lands owned by the corporations. There is no evidence contradicting his testimony that in the execution of such contracts he owned and furnished the material and equipment and employed the necessary labor. Prior to execution of the contract here involved, he had performed for the Company under only one contract in 1934, later moving some 25,000 feet for the Company, but under verbal agreement. He was also engaged in the business of buying timber and selling logs to various mills.

February 20, 1937, the Company purchased from Mrs. Sallie M. Erwin the standing timber on 340 acres of land in Drew county, the time for removal thereof being restricted to two years. April 3, 1937, the Company and Moore entered into a written contract under which, for a compensation of $10 per thousand feet, Moore agreed to cut, transport and deliver the standing timber to the right-of-way of the Missouri Pacific Rail-

road at Monticello. There is no evidence tending to question execution of the contract, or good faith of the parties. To the contrary, it is shown that from April 3 to April 23, Moore was engaged in executing the work contemplated by the contract. Original ledger sheets, showing the account of Moore with the Company from March 1, 1937, to April 3, 1937, as well as other original records and entries thereon—all of which were made prior to April 23—were introduced in evidence.

These records reflected that on April 9 settlement was had between Moore and the Company, in accord with terms of the contract, for 6,783 feet of logs. April 23 a like settlement, covering 22,035 feet of logs, was had. The record further shows that Moore lived on a farm containing 60 acres, which was "clear," some five miles distant from the plant of the Company in West Helena; that he was the owner of a truck and trailer, and a tractor, although the Company had advanced him some money and had taken a mortgage; that he owned log wagons, mules, and various other camp property, and that he transported this equipment to the lands and established a camp thereon. He took with him laborers then regularly in his employ, and at a later date hired log laborers, some of whom were employed by him to cut timber "by the thousand." He also employed persons owning trucks to transport the timber to Monticello. Settlements were made with his labor at bi-weekly periods, and up to June, 1937, payments were made by Moore from his own funds. Thereafter, laborers were paid by the "woods foreman" of the Company, Cox, but on payrolls made out by Moore, and at his direction, and receipts taken from each employee were introduced in evidence, showing performance of labor on "Arthur Moore's job."

Moore customarily returned to his home near West Helena on Friday preceding alternate Saturdays, to procure settlement with the Company for the amount due him under the contract. The bases for such settlements were "scale sheets" forwarded the Company by Cox.

In the execution of his contract, and in going to and from the land, Moore used a pick-up Ford truck, the

state license to which was in his name. April 23, 1937, he left camp in this truck, accompanied by one of his employees, Allen King, a tractor driver. He started from Monticello for West Helena to effect settlement for logs hauled during the preceding bi-weekly period. While on his way home the accident complained of occurred. Allegations that Moore and King were servants of the Company were met with the answer that Moore was an independent contractor; that neither Moore nor King was, or ever had been, employees of the Company. The contract between Moore and the Company was filed as an exhibit to the answer. There was no substantial proof to show that the contract was colorable, nor were there any allegations or proof that it was not *bona fide*. Plaintiffs contended only that phraseology of the contract, by reason of provisions relating to control and direction of operations, created the relation of master and servant, rather than owner and contractor; and that the Company had by conduct subsequent to the execution of the contract destroyed the relation of owner and contractor, if the contract did in law create such relation, and thereby created the relation of master and servant.

The case may be disposed of by a determination of two principal questions: (1) Does the contract between Moore and the Company, standing alone, create the relationship of owner and contractor? (2) If it be held that the contract did make Moore an independent contractor, is the evidence adduced by plaintiffs sufficient to show that the parties, by subsequent conduct, abandoned this contractual relation and substituted in lieu thereof the relation of master and servant?

If the first question be affirmatively answered, and the second one be answered in the negative, it necessarily follows that the Company would not be under any liability to plaintiffs. Correct determination of the first question necessarily involves consideration of the contract.

Preliminary to the contractual terms, it is first stated that the Company and the ''contractor'' have ''reached an agreement for the cutting, hauling and delivery of the

timber." The land on which it is situate is described; point of delivery is fixed; and the contractor was obligated to "actively begin work . . . within ten days . . . and continuously and diligently prosecute the work so as to complete the delivery of all the timber by the first day of July, 1937."

Section 1 provided that the contractor ". . . has or will provide at his own expense all the teams, logging equipment, labor, etc., necessary to reasonably guarantee the prompt and faithful cutting, hauling and delivery of all or any part of the timber and logs, within the time provided; and keep the timber and logs free from all liens or claims for labor or otherwise; and the corporation may require the contractor to reasonably satisfy it in that behalf before making any payment to him as herein provided."

Section 2 required the contractor to confine operations to such subdivisions as the corporation should direct. It further required him to cut and remove the timber from such subdivision most remote from delivery point. The particular subdivision on which the contractor "shall begin operations" was to be "as directed" by the Company.

Under Section 3 the corporation retained the power to "direct" as to the species to be cut and removed.

Section 4 provided that the timber should be cut in a careful and workmanlike manner, "as may be directed and changed in writing from time to time by the corporation," and that the full product of the tree should be obtained and logs cut to the best advantage in standard lengths.

Section 5 required delivery of the logs in a reasonable time and fixes a penalty on the contractor for default in this respect.

Section 6 required delivery of the logs within fifty feet of the loading equipment on track at Monticello; and the dumping grounds were to be prepared by contractor "at his own expense." If logs were lost or damaged, the contractor is held liable thereof.

Section 7 provided for measurement of logs delivered and bi-weekly statements therefor, on inspection and measurement by an agent of the Company. Contractor was to be furnished with a duplicate tally of logs scaled, which, without objection, was made final basis of settlement.

Section 8 covered the price per thousand feet to be paid contractor "for all logs delivered," but 10 per cent. of the contract price was to be retained until the contract was completely performed, and upon breach by the contractor, the amount retained was to be held by the corporation as liquidated damages. This section further provided: "In addition to the 10 per cent. retention to guarantee the performance of this contract by the contractor, the corporation shall also retain and deduct any amount which the contractor may owe it on any account whatever, including all amounts due it on account of the failure of the contractor, or his employees, to properly cut and log up the timber, or to promptly haul and deliver the same."

Under Section 9 the parties agreed that the Company might either permanently discontinue, or temporarily suspend, cutting and delivery of the timber.

By a long line of decisions this court is committed to the universal rule, that where the contractor is to produce a certain result, according to specific and definite contractual directions, agreed upon and made a part of the contract, and the duty of the contractor is to produce the net result by means and methods of his own choice, and the owner is not concerned with the physical conduct of either the contractor or his employees, then the contract does not create the relation of master and servant. This court has consistently accepted and stated the settled rule that even though control and direction be retained by the owner, the relation of master and servant is not thereby created unless such control and direction relate to the physical conduct of the contractor in the performance of the work with respect to the details thereof. *St. Louis, I. M. & S. Ry.* v. *Gillihan,* 77 Ark. 551, 92 S. W. 793; *Moore Lumber Co.* v. *Starrett,* 170 Ark. 92, 279 S. W. 4.

In the Gillihan Case, Mr. Justice HART said: "In general, it may be said that the liability of the company depends upon whether or not it has retained control and direction of the work. But neither the reservation of the power to terminate the contract when in the discretion of the engineer the work is not progressing satisfactorily, the right to exercise general supervision and inspect the work as it progresses, nor the right to enforce forfeitures, will change the relations so as to render the company liable."

In the Starrett Case, Mr. Justice WOOD defined an independent contractor as "One who contracts to do a piece of work according to his own method and without being subject to the control of his employer, except as to the result of the work."

Again, having under consideration a contract strikingly similar to the one here involved, as well as evidence also strikingly similar to that with which we are dealing, it was further said: "Now, under the above definition, according to the plain provisions of the written contract, the relation as between the company and Fleetwood at the time of the injury to appellee, was that of independent contractor rather than that of master and servant."

There is nothing in the contract showing an intent upon the part of the Company to retain control or direction of Moore in the exercise of the means or method by which he should perform the contract. There is no direction relating to the physical conduct of Moore, or his employees, in the execution of such contract. True it is there are certain directions to be observed by the contractor in the cutting of the timber, especially as to place and dimension; but these are specific and definite and are similar to plans and specifications so often found in contracts covering the performance of labor of similar character. Their design is to produce a given result. There are many decisions of this court holding to this effect. The governing distinction is that if control of the work reserved by the employer is control not only of the result, but also of the means and manner of the

performance, then the relation of master and servant necessarily follows. On the other hand, if control of the means be lacking, and the owner does not undertake to direct the manner in which the employee shall work in the discharge of his duties, then the relation of independent contractor exists. *St. L., I. M. & S. Ry.* v. *Cooper,* 111 Ark. 91, 163 S. W. 160; *Ark. Land & Lbr. Co.* v. *Secrist,* 118 Ark. 561, 177 S. W. 37; *Harger* v. *Harger,* 144 Ark. 375, 222 S. W. 736; *Harkins* v. *National Handle Co.,* 159 Ark. 15, 250 S. W. 900.

In the Harkins Case it was argued that because the Company reserved the right to control the kind, quality and quantity of the output, according to specifications and prices submitted, and because the right to cancel the lease and take possession of the property was reserved, and because the Company advanced money to meet pay rolls, which were made out on the Company's pay roll forms, the relation of master and servant was established. The opinion says: "None of the reservations by the lessor in the lease, . . . and none of the circumstances proven outside of the contract are inconsistent with the relationship of lessor and lessee. . . . . Rodgers (the contractor) employed his own labor, bought his own material and conducted the business according to his own methods. The handle company had no interest save in the output which it had purchased."

Our latest decision involving questions similar to those here presented is *Farmer Stave & Heading Co.* v. *Whorton,* 193 Ark. 708, 102 S. W. 2d 79. The opinion was written in 1937 by Mr. Justice BUTLER. The contract, under which it was alleged that Whorton became an independent contractor, rather than a servant of Farmer, was an oral one. The jury and trial court had found and held the evidence adduced sufficient to show that Whorton was a servant rather than an independent contractor.

The supervision and control proven in the Whorton Case were stated by Mr. Justice BUTLER in the following language: "Farmer furnished Whorton a mill and money to operate and gave him a certain price for the heading

delivered on board cars; that he, or someone else for the company, would go out to the mill occasionally to see how Whorton was getting along and to see that the heading was manufactured properly; that his company did not directly or indirectly exercise any control or supervision over Whorton further than to see that the heading *was sawed according to specifications."*

No vital distinction can be drawn between the control and supervision in the cited case and that reserved by the Company under the contract involved in the instant case.

There are countless decisions of appellate courts construing stipulations in contracts, such as here involved, relating to the right of the owner "to give directions"—"orders" and "instructions" regarding the work as it progresses; and phrases such as "in accordance with instructions"—"as directed"—"in such manner as shall be directed"—"under supervision of owner's agent, as he may direct"—and "under the direction and supervision." In all of the cases examined, some of which are cited, it is held that such phrases do not relate to the method or manner and do not govern the details or the physical means by which the work is to be performed. The Supreme Court of the United States has so held in two cases directly in point. *Casement* v. *Brown,* 148 U. S. 615, 13 S. Ct. 672, 37 L. Ed. 582; *U. S.* v. *Driscoll,* 96 U. S. 421, 24 L. Ed. 847.

In the Brown Case the contract provided that the work should be done in the most thorough, substantial and workmanlike manner "under the direction and supervision of the engineer of the company, who will give such directions from time to time during the construction of the work as may appear to him necessary and proper to make the work complete in all respects." Mr. Justice BREWER said: "The will of the company was represented only in the result of the work, and not in the means by which it was accomplished. This gave to the defendants the status of independent contractors, and that status was not affected by the fact that, instead of waiting until the close of the work for acceptance by the

engineer, the contract provided for daily supervision and approval of both material and work. . . . This constant right of supervision, and this continuing duty of satisfying the judgment of the engineer, do not alter the fact that it was a contract to do particular work, and in accordance with plans and specifications already prepared. They did not agree to enter generally into the service of the company, and do whatever their employers called upon them to do, but they contracted for only a specific work.''

In the Driscoll Case the contractor was required ''to furnish all labor, tools and machinery necessary to cut, dress and box certain granite, in such manner as should be directed.'' The contract provided that the United States should keep present at all times a superintendent and clerk—''to see that everything was done according to the contract.'' It was held that the relation of independent contractor existed.

*Gay* v. *Roanoke R. & Lbr. Co.*, 148 N. C. 336, 62 S. E. 436, involved a contract for the cutting and transportation of logs, similar to the one in the case at bar. The logs were to be cut and loaded on railroad cars, ''in a proper manner, the logs being secured to stand transportation, and the loading to be done according to directions given.'' There was a further provision that the contractor should ''cut the timber in proper and workmanlike manner, and as close as the employer may direct, and to cut all and every suitable tree into logs before leaving any one location.'' The court held that neither of these provisions negatived the relation of owner and contractor.

In *Stricker* v. *Industrial Commission*, 55 Utah 603, 188 Pac. 849, 19 A. L. R. 1159, the contract required that the ''rock should be quarried from such portions of the company's rock quarry as the company might from time to time direct, hauled and delivered to such place or places as the company or its representatives may designate or direct.'' Regardless of these provisions, the court held that the relation of owner and contractor existed.

In *Goode* v. *Johnson*, 38 Colo. 440, 88 Pac. 439, 8 L. R. A., N. S., 896, the Supreme Court of Colorado had

for construction a contract which provided that the work was to be performed under the direction and supervision of an engineer, who was given authority to discharge any employee of the contractor if the interest of the owner demanded. He was empowered to increase the force to further the progress of the work; and the right was reserved to enter upon, take possession, relet or perform if deemed expedient to do so. The right of temporary suspension or permanent discontinuance was reserved. The engineer had the power to direct application of forces to any portion of the work, as his judgment required; and the right was reserved to directly pay laborers to avoid liens for work done. The court said: "In the light of these considerations, and from the language of these particular clauses, interpreted in the light of the entire contract, including the plans and specifications which are a part thereof, let us proceed to examination of these provisions which plaintiff says give rise to the relation of master and servant. In our judgment, neither of these clauses, nor all combined, have the effect which plaintiff contends for them as the reviewing of some of the leading authorities will disclose."

Numerous decisions are then cited, and the court further said: "The fact that the company pays the employees of the contractor directly in order to protect itself against liens, does not destroy the independent character of such employment. Clauses similar to those in the present contract, and still other provisions relating to supervision which the owner retained over the work, some of which go much further than any reservation herein contained, have been construed by courts, and *almost universally held* not to make the relation thereunder that of master and servant. On the contrary, such employment is ruled to be an independent one exempting the owner from the negligence of the contractor."

The Supreme Court of Mississippi has had, in recent years, numerous occasions to construe contracts similar to the one here involved. In *Hutchinson-Moore Lumber Co.* v. *Pittman*, 154 Miss. 1, 122 So. 191, the

contractor agreed to fell and saw certain standing timber into logs. He agreed to fell the trees, "within 12 inches of the ground, and cut into lots of such lengths, as may be designated from time to time by the company." It further provided that the contractor should be "governed at all times by instructions from the company as to where timber shall be cut and the sequence in which governmental subdivisions shall be entered." The company reserved the right to "authorize and direct the temporary abandonment of any particular part of the timber and direct operations to be conducted at some other point." The court held that the contract did not create the relation of master and servant; that the method and manner of bringing about the results were left with the contractor, and that under the plain provisions thereof the relation of independent contractor existed.

In *Louis Werner Sawmill Co.* v. *Northcutt*, 160 Miss. 441, 134 So. 156, it was expressly held that the employer might reserve the right to require laborers to perform their work according to certain prescribed rules; and, by so doing, the relation of owner and independent contractor would not be affected.

In *McDonald* v. *Hall-Neely Lumber Co.*, 165 Miss. 143, 147 So. 315, Gray contracted with the lumber company to haul logs from a tract of timber to its mill. The court says: "Appellee contracted with Gray for a certain net result, namely, the placing on appellee's mill yard of certain logs, the manner and means, and the expense of doing the work being left entirely to him. The relation of master and servant does not exist, unless the master has some sort of substantial control over the means and methods of carrying out the contract. What logs Gray should haul and where he should place them did not constitute such control by appellee."

The most recent decision by the Mississippi court is *Cook* v. *Wright*, 177 Miss. 644, 171 So. 686. The court said: "This question has, within the last few years, often been before this court. From all the cases and the text, we see that the ultimate question for decision is whether the physical conduct of the contractor in the performance

of his duties is controlled, or is subject to the right of control, by the owner or employer in respect to the details of the work; and we can further say, with a sufficiently approximate accuracy, as to the claims of cases such as the one now before us, that where the subject of the contract is to produce a certain net result, according to plans and specifications, reasonably specific and definite in their end, already agreed upon and made a part of the contract, and the contractor's obligation is to produce that net result by means and methods over which, in the performance, so far as concerns the details of the management of the means and of the physical conduct of himself and his employees thereinabout, has and is obliged to have, his own control, the contract is one for service, not of service, and the relation of master and servant does not exist."

In all of the cases cited from other jurisdictions, the court reviewed at length innumerable cases and then stated and applied the accepted rule. This court, in the *Secrist Case,* 118 Ark. 561, 177 S. W. 37, said: "Reservation or exercise of control does not fix liability unless the owner undertakes to direct the manner in which the employee shall work in the discharge of his duties."

In *Harkins* v. *National Handle Company, supra,* it was contended that because appellee reserved the right to "control the kind, quality and quantity of the output, according to specifications" and "the right to cancel the lease and take possession of the property" and because "it advanced money to meet payrolls," the relation of master and servant was established. It was held that such reservations, and none of the circumstances proven outside of the contract, were inconsistent with the relation of lessor and lessee.

In *Pine Woods Lumber Co.* v. *Cheatham,* 186 Ark. 1060, 57 S. W. 2d 813, there was a verbal contract under which one Deckard agreed to cut and haul timber from certain lands to a named delivery point. Deckard was to furnish teams, equipment and laborers necessary to do the work. The trees were cut and sawed into logs of lengths "as directed by the woods foreman." The own-

er's bookkeeper made out the payrolls, paid the laborers in cash, and charged the contractor's account. Settlements were made on scale sheets and advances for fee bills were deducted. This court said: "The testimony, in all essential parts, reflected, without substantial dispute, that Deckard was an independent contractor."

It is our view that the contract here involved created the relation of owner and contractor, rather than that of master and servant. Under its express terms, Moore was employed to carry on an independent piece of work; to act pursuant to the agreement in the manner outlined, and to remove and transport the timber from a definite area and within a fixed time. He was obligated to perform on specified terms, in a particular manner and for a fixed compensation. The Company was interested only in the result to be obtained, and the method or manner of accomplishment was left solely with Moore. Contractual provisions similar in every respect to those found in this contract have been generally construed as we herein hold.

[2] Is plaintiffs' evidence sufficient to show that the Company, by subsequent conduct, abandoned the relation of owner and contractor and created that of master and servant?

Only three witnesses testified in this respect. Deal, a merchant at Monticello, whose deposition was taken, stated that on May 17—after the accident April 23—Moore and Cox applied to him for a line of credit for Moore. During May, June and July he sold Moore certain merchandise, the invoices therefor being given to Cox, and checks in payment were received from the Company's office in West Helena. The books of the Company reflected that these invoices were regularly charged to Moore's account.

Henry Lee Shelton testified that he began working on the Moore job about the last of June or first of July, cutting timber for Moore by the thousand. Moore showed him the timber and put him to work. Cox, the woods foreman, was not there when witness went to work. On his direct examination, after having stated

that he cut logs, and in answer to the question, "Who directed you where to cut them?", he replied, "Mr. Moore." He then stated that Cox was "on the job" only twice while he was there, and then in answer to the question if at any time he took orders from Mr. Cox, he answered, "Yes, sir." There was this further testimony:

"Q. What orders did Mr. Cox give you? A. Well, he just told us to keep the stumps down pretty low."

On cross-examination the following questions and answers appear in the record:

"Q. On your direct examination you stated that all he ever told you was to cut the stumps low? A. Yes, sir. Q. Is that correct? A. Yes, sir. Q. When you spoke then of him giving you orders, that was the only order he ever gave you? A. Yes, sir. Q. That is the only time he ever attempted to direct you in any manner whatsoever? A. Yes, sir. Q. All he told you was to cut the stumps low? A. Yes, sir. Q. Did Mr. Cox at any time, or during the time you were cutting there, complain as to the manner or method of cutting the logs? A. Not that I remember."

Luke Moore, witness for plaintiffs, testified that he was employed by Arthur Moore; that he first talked to Arthur Moore about a job; that Moore told him he had a contract with Chicago Mill. He then talked to Cox, for the purpose of finding out whether he would be paid, and Cox said, "It will be all right to go ahead and go to work." Cox told him not to worry about it. "He never said he would see that I got the money. He said there was a good company behind it, and not to worry about being paid."

Witness then went to Moore, agreed with him to cut timber for $1.25 per thousand feet, and "that was the way he made the agreement with Moore to cut the timber." Moore showed him the timber and put him to work. In answer to the direct question, "Do you know who had charge of the hauling of that timber," witness stated: "Mr. Moore had the contract to get it out of the woods."

As to orders or directions given by Cox, witness stated that Cox came into the woods once or twice a week, told the cutters what lengths to cut logs—some 10, 12, 14, and 16 feet; that he wanted the timber cut down low, no rough timber cut, and the logs "butted off." In answer to the question, "Did Mr. Moore at any time state to you who he was working under out there, his immediate superior or boss," witness answered, "No, sir, he had a contract to cut the timber."

On cross-examination this witness stated that the instructions referred to in his direct examination on the part of Cox were given to Moore, in the presence of the cutters.

"Q. He was talking to Mr. Moore about it in your presence? A. Yes, sir. Q. Mr. Cox did not complain to you, he was complaining to Mr. Moore about it in your presence? A. Yes, sir. Q. And Mr. Cox told Mr. Moore that the logs would have to be cut different, or else? A. Yes, sir."

Witness further testified that Moore personally made two or three pay rolls. After the accident, the laborers were paid by Cox, on pay rolls made out in Moore's handwriting, in the presence of Moore, and at his direction. Receipts taken from each of the laborers for work done after the accident were introduced in evidence and showed payment for "labor done on A. Moore's job."

The testimony quoted is, in substance, all of the evidence introduced on behalf of plaintiffs tending to show such control or direction on the part of the Company.

All of the evidence introduced by the Company was to the effect that Cox, its woods foreman, was supervising execution of this particular contract, as well as various others in which it was contemporaneously interested in the immediate vicinity; and that Cox did not exercise such degree of control or direction over the means and method by which Moore performed this particular contract as would have the effect of altering the legal status of the parties.

*Moore Lumber Co.* v. *Starrett,* 170 Ark. 92, 279 S. W. 4, is directly in point. A written contract was involved. The timber was to be cut according to specifications. The contractor was to save the company "harmless against all claims for labor, maintenance, etc." Instructions were given as to "the manner in which the lumber shall be cut." At times the company paid the laborers and charged the account of the contractor. The owner directed the contractor regarding dimensions into which the lumber was to be cut. The testimony showed that on occasions the owner would go through the mill, give orders and directions if he saw anything of which he did not approve, and caution laborers as to the manner in which the work should be done. In the opinion, Mr. Justice Wood said: "In the absence of any proof tending to show that the written contract was a mere camouflage to cover up the real relation between the company and Fleetwood, and that such relation was in fact merely that of employer and employee, or master and servant, the court should not have ignored the plain and unambiguous terms of the written contract, and should have declared as a matter of law that the relation of master and servant did not exist, as requested by appellant."

Decisions of the Supreme Court of Mississippi, cited *supra,* each of which involves contracts essentially similar to the case at bar, and in which the evidence was strikingly similar to that in the instant case, are directly in point, and the holdings are in accord with decisions from courts of other jurisdictions—that is, that such evidence is without probative value.

The Supreme Court of Wisconsin, in *Medford Lumber Co.* v. *Mahner,* 197 Wis. 35, 221 N. W. 390, in a case similar in point of fact to the one at bar, said: "It is further claimed that the lumber company did actually control the details of the work. It is unnecessary to refer to the evidence which it is claimed sustains this conclusion. We have given such evidence our consideration. It consists of admissions of the general manager that he went through the woods occasionally, about once a week, and

talked with Mahner about the job, and the superintendent would go to the job occasionally, look around through the woods, talk to Mahner, and talk about how the work was going. 'They said it was either going all right,—otherwise, if it wasn't, they told him. He walked through the woods, looked around, and seen the logs being cut. If they were cut too short, he would tell them to cut them longer. He said that to the fellows who were sawing.' There is no evidence that the company exercised the right to hire or discharge men, or to exercise any authority over the manner of performing the work. The contract required the logs to be cut in a certain length. This was the ultimate result sought to be accomplished by the contract. Logs cut too short might work a serious loss to the company and it was its privilege and its duty to see that they were cut the proper length. Even though this was spoken of to men in the woods when logs were seen to be cut too short, it was no evidence of an attempt on its part to control the details of the work. We discover no conduct on the part of the company amounting to a practical construction of the contract inconsistent with the natural meaning of the language employed therein.

"Some contention is made that the fact that the lumber company paid the men employed by Mahner upon the presentation of a time order justifies the conclusion that the men working under Mahner were really employees of the company. Advancements are customarily made under such contracts as the work progresses. The company was interested in seeing that the men who worked for Mahner received their pay, this to free its timber of log liens. Advances made in this way protected the company and constituted the proper and businesslike method of handling the situation. The method pursued cannot give rise to an inference in view of the written contract that the employees of Mahner were really the employees of the company."

The following cases from other jurisdictions, cited in the brief of the appellant company, are found to involve contracts in phraseology similar to the contract here questioned. They sustain the view that supervision

for the purpose of determining whether the work is being done in accordance with the contract, and exercise of that right, do not affect independence. *McBride* v. *Madden Shingle Co.*, 173 Mich. 248, 138 N. W. 1077; *Davis* v. *Came-Wyman Lumber Co.*, 126 Tenn. 576, 150 S. W. 545; *Keech* v. *Roper Lumber Co.*, 166 N. C. 503, 82 S. E. 836; *Scales* v. *First State Bank*, 88 Ore. 490, 172 Pac. 499; *Gay* v. *Roanoke R. & Lumber Co.*, 148 N. C. 366, 62 S. E. 436; *Hopper* v. *Ordway & Sons*, 157 N. C. 125, 72 S. E. 839; *Clark* v. *Tall Timber Co.*, 140 La. 380, 73 So. 239; *Chicago, etc., Ry. Co.* v. *Bond*, 240 U. S. 449, 36 S. Ct. 403, 60 L. Ed. 735; *Salmon* v. *Kansas City*, 241 Mo. 14, 145 S. W. 16; *Prest-O-Lite Co.* v. *Skeel*, 182 Ind. 593, 106 N. E. 365, Ann. Cas. 1917A, 474; *Montain* v. *Fargo*, 38 N. Dak. 432, 166 N. W. 416; L. R. A. 1918C, 600; Ann. Cas. 1918D, 826.

As to the contention by counsel for appellees that the contractual provision reserving to the Company the power to permanently discontinue operations under the contract does, in and of itself, create the relation of master and servant, but little need be said. It is urged that this provision is in reality a "power to discharge," and cases are cited which hold that the unrestricted right of discharge is a very important circumstance tending to disprove the relation of independent contractor. These decisions are not unsound law when applied to facts actually involved, but they are not applicable to the situation here presented. The parties to this contract agreed that work might be temporarily suspended or totally rescinded. They were competent to make such an agreement and, as such, it is distinguishable from an "unrestricted right of discharge," a condition which usually arises where the work to be done is general and indefinite, rather than definite and specific, in character. That such is true is shown by the decision of the Supreme Court of South Dakota in *Cockran* v. *Rice*, 26 S. Dak. 393, 128 N. W. 583, Ann. Cas. 1913 B, 570, relied on by counsel for appellees. Therein, the defendant merely employed Stevens to plow on a 40-acre tract of land at an agreed compensation of $1.25 per acre. The court recognizes

that a contract of independent employment is one which contemplates a definite beginning, continuance and ending. It is said that "the unrestricted right of the employer to end the particular service" is of great bearing on the relation created. But, in the case then under consideration, there was no contract to plow a specified number of acres, and Stevens could have plowed or quit as and when he chose. As said by that court, the contract was merely to pay for such plowing as might be done at a given rate per acre and did not make Stevens an independent contractor. We have carefully examined the remaining decisions cited by counsel for appellee, on this particular phase, and find them without bearing on the facts here presented. Moreover, the great weight of authority is to the effect that the reservation of the right to terminate the contract does not affect the independence. The following cases expressly so hold: *Good* v. *Johnson,* 38 Colo. 440, 88 Pac. 439, 8 L. R. A., N. S. 896; *Odle* v. *Charcoal Iron Co.,* 217 Mich. 469, 187 N. W. 243; *Ellis & Lewis, Inc.,* v. *Trimble,* 177 Okla. 5, 57 Pac. 2d 244; *Moore* v. *Roberts,* (Tex.) 92 S. W. 2d 236; *Gogoff* v. *Industrial Commission,* 77 Utah 355, 296 Pac. 229; *Leech* v. *Sultan Ry.,* 161 Wash. 426, 297 Pac. 203; *Beck* v. *Dubach Lumber Co.,* 171 La. 423, 131 So. 196; *Arthur* v. *Marble Rock School Dist.,* 209 Ia. 280, 228 N. W. 70, 66 A. L. R. 718; *Nelson Bros. & Co.* v. *Industrial Commission,* 330 Ill. 27, 161 N. E. 113; Strong's Case, 277 Mass. 243, 178 N. E. 637.

In *Schroer* v. *Brooks,* 204 Mo. App. 567, 224 S. W. 53, a Missouri case, the Supreme Court of that state held that one who had contracted to cut logs "by the thousand," who determined his own hours of labor, used such appliances as he saw fit, and employed his own laborers, was not a servant, even though the contract under which he worked was terminable at will by the owner. The court said: "Had the defendant sought to terminate the cutting of logs and ties, he would not have discharged Britts from his employ; he would merely have terminated the contract, which was reciprocal, in that Britts could likewise terminate the contract at any time."

There seems, therefore, to be unanimity of opinion that under contracts similar to the one here involved, Moore would be an independent contractor and not a servant of the Company. The evidence is insufficient to show that the Company committed any act which would convert such relation into that of master and servant. Therefore, the Company is not liable to the plaintiffs in this action under the doctrine of *respondeat superior*.

According to statement of counsel for appellees in their brief, all available witnesses have appeared, and the case has been fully developed. The judgments in favor of the several plaintiffs against the Chicago Mill & Lumber Company are reversed, and the several causes of action are hereby dismissed.

Mr. Justice HUMPHREYS and Mr. Justice MEHAFFY dissent as to that part of the decision which reverses the judgments against Chicago Mill & Lumber Company, but in other respects concur.