FROMAN *v.* J. R. KELLEY STAVE & HEADING COMPANY.

4-5321                                    123 S. W. 2d 1081

Opinion delivered January 16, 1939.

*W. J. Dungan* and *Ross Mathis,* for appellant.
*E. W. Moorhead* and *C. W. Wall,* for appellee.

546

GRIFFIN SMITH, C. J. From a verdict directed against appellant, who was plaintiff below, this appeal is prosecuted on the theory that the trial court erred in finding that A. D. Froman (appellant's brother) had independently contracted with J. R. Kelley Stave & Heading Company to operate a mill owned by the latter.

The injury occurred while appellant was standing back of an employee who was operating an equalizing saw. Appellant testified that he had worked for the Stave Company about ten years. Just before the injury was inflicted he observed that the operator of the equalizing saw[1] was behind with his work. This caused a general slowing down. It was customary, in such circumstances, to help out. In the process of manufacturing staves, bolts were conveyed in a small wagon immediately behind the sawyer. The sawyer, if unassisted, had to turn partially around to pick up the bolts, but if they were handed to him time was saved. Appellant, on his own volition, undertook to speed the output by lending a helping hand. He says the sawyer negligently fed a bolt too rapidly against the saws. This would cause the teeth to clog, and dust which ordinarily followed past the carriage and into a chute beneath the carriage table would be misdirected; or, in the alternative, if errant sawdust did not in the manner thought probable by appellant cause his injury, then bark or a splinter was thrown from the bolt with such violence that appellant could not avoid being struck in the left eye, as a consequence of which the sight has probably been lost.[2]

[1] An equalizing saw is described as "a couple of saws on each side with arms out this way [indicating]. They work on hinges. A man picks up a bolt and lays it on the arm and pushes it through there and cuts the ends off." The effect of this operation would seem to be that the bolt is pushed in such manner that it passes against saws which simultaneously cut off each end.

[2] Appellant's partial description of the accident is: "I passed [the equalizing saw operator] the bolt. It was not such a large bolt. The best I remember, he took the bolt and laid it in the carriage and the carriage went back to the trip. It was more of a swing fastened overhead, and it had two arms. He tripped this bolt. . . . When he tripped this it fed into the saw too fast, which clogged up the teeth and carried the stuff over and threw it out over the top and it hit me in the eye. . . . If the bolt had been pushed into the

Ordinarily the equalizing saws were manned by Hall or Brown. Fred Froman (another brother) testified that at the time in question the saw was being operated by Hall. In a statement signed by appellant, Brown was mentioned as the operator. Although appellant testified he could not read or write, and that the statement was prepared by an insurance representative, he did not allege any specific inaccuracies. When asked if he had "told them those facts recited in the statement," appellant replied: "I won't say, because I don't remember; part of it might be true and part of it might not." The part that might not be responsive was not explained.

On direct examination A. D. Froman testified that he was working for the Stave Company; payrolls were made up and the men were paid at Shackleford's store at DeWitt, not far from the mill; witness was doing piece work for the Stave Company; had no contract for a definite period; was not employed to make any specified number of staves; the Company had a right to discharge him at any time; Hudkins was general manager for the Stave Company; staves were made according to Hudkins' instructions.

On cross-examination Froman testified he was paid $5 per thousand for staves; the Company bought the bolts; witness hired the men who worked under him, and could discharge them. The question was asked: "Did Hudkins have anything to do with [employing and discharging] the men?" His reply was: "Not a thing."

"Q. Who owned the property—the stave mill? A. J. R. Kelley Stave & Heading Company. Q. You operated it? A. Yes, sir. Q. Mr. Hudkins had nothing to do with the operation of it? A. No, sir. Q. What did he do? A. He was supervisor of the mill; he bought the bolts and timber and loaded out the staves. Q. You did have charge of running the machinery and making the staves out of the bolts? A. Yes, sir. . . . I paid my men by the thousand. . . . I made out the payroll and [the men]

saw properly the accident likely would not have occurred. They have run for years and I never knew them to hurt anybody before. . . . If you don't feed the timber in there properly it will throw dust. I have never seen one that won't do it."

were paid off at the store. Q. You stated a while ago that the J. R. Kelley Stave & Heading Company paid them; was that for your benefit? A. They paid off the employees. Q. They were your employees? A. Yes, sir.''

The same witness further testified that the Stave Company charged h i m with amounts paid employees ''against the total amount [I] received under [my] contract,'' and the difference between the total sum due at $5 per thousand and deductions for the payroll would be A. D. Froman's profit. During the week in which the accident occurred, 17,250 staves were made. The payroll was $68.97, and the Stave Company ''paid the payroll off and paid me the balance. A weekly time sheet was made out, showing the names of the men who were working under witness. All were paid on a per thousand basis.

Continuing his testimony, A. D. Froman said that C. M. Froman's duties were those of a filer and millwright. [A millwright] ''keeps the machinery in working order and sees to it that it is all working; files saws. He would go around over the mill from place to place looking after the machinery.''

''Q. Did he supervise the men in their work? A. If they didn't know how to do their work he showed them how. Q. Did he do that while you were gone, and while you were at the mill also? A. Yes, sir. Q. All Mr. Hudkins did around the mill was to look after the timber and staves, and see that you turned out staves according to requirements? A. Yes, sir.''

On redirect examination appellant's attorney asked: ''You didn't pay these men at all out of your money?'' The answer was: ''Certainly; out of my contract.''

It is conceded that the saws were in good condition. Defects with respect to any of the machinery are not alleged.

Other testimony shows that at the end of each week (or when payment was desired for a specified number of staves), A. D. Froman would draw on the Stave Company at $5 per thousand. The instrument by which a transfer of funds was effectuated is referred to as a draft, and as a check; but under any classification—whether draft or check—it evidenced the amount due for

a finished product manufactured by A. D. Froman; and Froman had a contract to operate the mill with means and by methods of his own adoption. Hudkins visited the plant about once a week. It is true there is testimony that Hudkins was superintendent of the mill, but immediately the witness amplified this assertion by explaining that such supervision consisted of buying the bolts and timber, and loading the staves.

Fred Froman thought that under a contract made by the Stave Company similar to the one here shown, Hudkins had discharged two men "some few years ago at Hunter." Arrangement with the Stave Company at Hunter, and the plan of operation at DeWitt, were "practically the same—I know, because that was the only way my brother would take a contract."

Facts in the instant case are so similar to the facts in *C. M. Farmer Stave & Heading Company* v. *Whorton*, 193 Ark. 708, 102 S. W. 2d 79, that the rule there announced must control here. Farmer, president of the Company, testified to ownership of a number of mills. These mills were turned over to parties with whom contracts were made for their operation. The Farmer Company furnished money for use in purchasing timber and staves—"paid a certain price for staves delivered on board the cars."[3] It was held that Whorton was not

[3] In the Farmer Stave & Heading Company Case, Farmer had testified: "We hired these men; they took it by contract, and we would furnish them the mills and the money, and contract for them to make staves and heading; I was superintending the operation at the time and furnishing the mills and the money and they were operating the mills for us; we made an agreement with them to go and make these staves and give them so much a thousand for them delivered on board cars." Asked to explain further, Farmer said: "Well, I meant this: we bought these mills; we turned these mills over to fellows to operate, and furnished them money; we gave them a certain price for staves delivered on board the cars; now, that is to what extent we operated the mills." Again testifying, Farmer said that he or some one acting for him would occasionally go out to the mill to see how Wharton was getting along and to see that the heading was being manufactured properly; that his company did not, directly or indirectly, exercise any control or superintendency over Wharton in the operation of the mill further than to see that the heading was sawed according to specifications; that Wharton was paid no salary and that he used the mill after suit was filed making heading and selling it to other parties.

entitled to recover for personal injuries alleged to have occurred because of faulty equipment.

In a more recent case—*Moore and Chicago Mill & Lumber Co.* v. *Phillips, ante,* p. 131, 120 S. W. 2d 722, we held that where one was employed to perform on specified terms, in a particular manner, and for a fixed compensation, and where the employer was interested only in the result to be obtained, and the method or manner of accomplishment was left solely with the party who was to perform, such employer was not liable in damages under the doctrine of *respondeat superior* to persons injured through negligence of the person whose duty it was to produce the results contemplated by the contract, unless, by actions subsequent to the contract, the employer's conduct amounted to an abandonment of the relation of owner and contractor and created that of master and servant. See, also, *Wilson* v. *Davison, ante* p. 99, 122 S. W. 2d 539.

The special judge correctly directed a verdict on the ground that A. D. Froman was an independent contractor, and that appellant was his employee, and not the servant of appellee.

We are also of the opinion that appellant assumed the risk.

The judgment is affirmed.

HUMPHREYS and MEHAFFY, JJ., dissent.