J. L. WILLIAMS & SONS, INC., v. HUNTER.

4-5687

133 S. W. 2d 892

Opinion delivered December 4, 1939.

*Isaac McClellan* and *Bridges, Bridges & Young,* for appellant.

*Curtis R. Duvall, H. B. Means* and *Joe W. McCoy,* for appellee.

GRIFFIN SMITH, C. J. Appellant's motion for a new trial alleges 26 errors. Assignment No. 24 is determin-

ative: the court erred in refusing defendant's requested instruction No. 1.[1]

Appellee, alleging that while employed by J. L. Williams & Sons, as a log cutter, he received personal injuries, seeks compensation upon the theory that a fellow servant's negligence was the proximate cause. Averment is that while appellee was attempting to move a limb from a tree he and Havis Wilson had felled, Wilson suddenly severed the limb from the body of the tree. It is admitted that it was Wilson's duty to cut the limbs, but negligence is urged in that Wilson failed to notify appellee that he intended to sever the particular limb in question, and that there was a failure to use ordinary care in ascertaining appellee's position of peril.

We do not determine questions of assumed risk and contributory negligence. Since appellant's request for an instructed verdict should have been given, other points of controversy are unimportant. The instruction was necessary because appellee was a servant of Z. T. Allen, a contractor independently employed by appellant, and appellant did not exercise supervision over the methods employed in producing contractual results, nor did it interfere with operations by directing the means of production.

Transactions relied upon by appellee to prove (1) that Allen was not an independent contractor, and (2) that if such relationship originally existed it was destroyed insofar as appellee is concerned by conduct of appellant and its agents, are that Tom Allen (appellant's woods foreman and a brother of Z. T. Allen) told workers what length logs were to be cut. It is further claimed that the foreman informed the men that the federal wage and hour law had become effective and that it would be necessary for employees to cut enough footage to earn $1.25 a day "or hunt another job"; that a company employee scaled the logs; that if Tom Allen were

---

[1] Assignment No. 24 is: [The verdict should be set aside and a new trial granted] "Because the court erred in refusing to give defendant's requested instruction No. 1 over the objections and exceptions of the defendant [as follows]: 'You are instructed to find for the defendant, J. L. Williams & Sons, Inc.'"

in the woods he would tell the workers what size timber should measure at the stump; also, he would direct them how to care for the small growth. He usually came out once a week (sometimes two or three times a week), but at other times would send word by the drivers. Orders were issued on appellant's commissary. Appellee and Wilson each earned 62½ cents per thousand feet for their work in producing log lengths. Appellee "got one check from J. L. Williams & Sons."

Appellee conceded that Z. T. Allen was the only one who talked to him about the job, but insisted that the Williams company required its employees to carry insurance. Appellee had served a penitentiary sentence for burglary and grand larceny. In connection with his employment, appellee testified that Z. T. Allen told him he (Allen) "had room for another saw hand for J. L. Williams & Sons".

Z. T. Allen testified to a contract with appellant, made through Tom Allen. Logs were to be delivered on skidway for $7.50 per thousand feet. Allen furnished his own trucks and other equipment and employed his own men—"I just worked under a contract to put the logs to the mill at that price". Witness had done contract work of a similar nature for others. He employed appellee and Wilson, but arranged through the Williams company to get advances.—"I made arrangements with the bookkeeper to pay these saw hands when their time came through so I would not have to keep up with it. They got groceries at the commissary regularly and [the amounts paid appellee and Wilson] were deducted [in arriving at the balance due me by appellant]."

Allen also testified that the men were paid by appellant's bookkeeper or cashier, but that such payments were charged to his logging account. Witness admitted that his truck was in the name of one of his sons, and that a team was in the name of another. He did not make any profit on the work done by appellee or Wilson.

Appellant's bookkeeper testified that logs coming in from a particular job were measured by mill scalers. If the contractor wished a person to be paid, the scaler

was instructed to prorate the credits at so much per thousand feet, or at so much per day, or in such manner as the contractor might direct. Such items were credited to the men whose names were handed in by the contractor and were charged against the logs. In this way it was designated that Hunter and Wilson should receive $1.25 per thousand feet on logs marked "No. 4", with a corresponding charge to Z. T. Allen's account. The amounts absorbed by Hunter and Wilson at the commissary were likewise charged to Allen's account.

There is this testimony by the bookkeeper: "Every employee of the company is required to pay 1% of his wages to social security and the company is required to pay 1%. If Jesse Hunter and Havis Wilson had been carried on the books as company employees they would have been required to pay monthly 1% of their wages . . . Z. T. Allen did not have a social security account, as he was not an employee."

Tom Allen admitted having told different groups of loggers that the wage and hour law had been enacted by congress, and says he told the contractors they would be expected to comply with its terms. He insisted, however, that he was not talking with or addressing the men other than by way of information.

There is accord in respect of the circumstances of appellee's employment to this extent: he was told by Z. T. Allen that the latter had a place for him.

In effect there is no difference in the testimony regarding methods of payment as explained by witnesses for the disputants. Controversy arises over effect to be given conceded transactions, or inferences to be drawn from beliefs and suppositions.

Allen's contract was oral. As to its terms, neither appellee nor his witnesses professed to have information. If its tenor was that testified to by Allen, he was not an employee of appellant. Given its highest probative force, the evidence on behalf of appellee assumed that because of certain conduct upon the part of Z. T. Allen and appellant, there was a reasonable inference that Allen was appellant's servant, or that his activities were

directed to such an extent as to superimpose upon appellant responsibility for the methods utilized in reducing the trees to sawlogs. To sustain this contention the activities of Tom Allen in specifying log lengths, in instructing as to care of small timber, and other collaborations are pointed to.

The naked statement of appellee that he was working for appellant is his own conclusion. It is possible he believed this to be true. He had been reared by the Allen family. As one of witnesses expressed it, "he had grown up in their home". Quite naturally he did not question Z. T. Allen when the latter stated that employment was available. Payment at the commissary, or by appellant, in the manner described by appellant's bookkeeper and concurred in by appellee, was not inconsistent with Allen's contract to deliver logs at $7.50 per thousand feet. Credit at the commissary was a matter of mutual convenience.

It is common knowledge that hundreds of logging operations throughout the state are constantly handled under contract, both oral and written, which leave to the performing party complete independence in effectuating the purposes of such contract. While the facts of each case should be carefully examined when suits are filed for personal injuries resulting from operations conducted by so-called independent contractors, something more than speculation and conjecture is necessary to convert a bona fide contract independently performed into one of master and servant.

In *Moore and Chicago Mill & Lumber Company* v. *Phillips,* 197 Ark. 131, 120 S. W. 2d 722, there is a review of decisions of this court dealing with the controverted subject of independent contractor, or master and servant. Many cases from other jurisdictions are cited.

We think the principles announced in the Phillips Case are controlling here. Attention is directed to *Farmer Stave & Heading Company* v. *Whorton,* 193 Ark. 708, 102 S. W. 2d 79. An oral contract was there involved.

For the error heretofore mentioned the judgment is reversed, and the cause dismissed.